**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

LOS ANGELES CITY EMPLOYEES'  )
RETIREMENT SYSTEM, on behalf of  )
EXP WORLD HOLDINGS, INC.,  )
   )
       Plaintiff,  )
   )
       v.  )   C.A. No. 2024-0998-KSJM
   )
GLENN SANFORD, RANDALL  )
MILES, DAN CAHIR, JASON  )
GESING, EUGENE FREDERICK, and  )
JAMES BRAMBLE,  )
   )
       Defendants, and  )
   )
EXP WORLD HOLDINGS, INC.,  )
   )
       Nominal Defendant.  )

**OPINION**

Date Submitted: July 28, 2025
Date Decided: January 16, 2026

Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Hannah Ross, Rebecca E. Boon, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Hydee Feldstein Soto, Joshua Geller, Miguel Bahamon, Gina Di Domenico, OFFICE OF THE LOS ANGELES CITY ATTORNEY, Los Angeles, California; *Counsel for Plaintiff Los Angeles City Employees' Retirement System*.

Ned Weinberger, Mark D. Richardson, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; John Vielandi, Alfred L. Fatale III, Charles Wood, LABATON KELLER SUCHAROW LLP, New York, New York; *Counsel for Additional Plaintiff Building Trades Pension Fund of Western Pennsylvania*.

Rudolf Koch, Matthew D. Perri, Mari Boyle, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendant Glenn Sanford*.

Albert H. Manwaring, IV, Albert J. Carroll, Kirsten A. Zeberkiewicz, MORRIS JAMES LLP, Wilmington, Delaware; *Counsel for Defendant Randall Miles*.

A. Thompson Bayliss, Florentina D. Field, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Defendant Jason Gesing.*

Joseph B. Cicero, Ryan M. Lindsay, Dakota B. Eckenrode, CHIPMAN BROWN CICERO & COLE LLP, Wilmington, Delaware; *Counsel for Defendant Eugene Frederick.*

Elena C. Norman, Skyler A. C. Speed, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Joanna A. Diakos, K&L GATES LLP, New York, New York; Stephen G. Topetzes, Theodore L. Kornobis, K&L GATES LLP, Washington, District of Columbia; *Counsel for Defendant James Bramble and Nominal Defendant eXp World Holdings, Inc.*


**McCORMICK, C.**

Nominal Defendant eXp World Holdings, Inc. provides cloud-based real estate services. For many years, top eXp agents Michael Bjorkman and David Golden allegedly drugged and raped eXp real estate agents at company-sponsored events. A dozen other eXp agents allegedly participated. A social media post accusing Bjorkman of assaulting multiple women during a company event went viral in September 2020. The board terminated Bjorkman but continued paying him. A month later, an eXp agent sent a memo to company executives detailing seven incidents of Bjorkman's and Golden's behavior. The recipients included the CEO who sat on the board. The board did nothing. Twenty survivors reported these crimes to an eXp director who turned whistleblower. The whistleblower raised the issue at two separate board meetings. The board later launched an internal investigation, but it was led by insiders. And nothing changed until survivors filed anti-trafficking claims against the company in 2023.

The defendants here are not alleged to have harassed, drugged, assaulted, or raped anyone. Rather, according to the plaintiff who owns eXp stock, the defendants harmed the company by allowing their agents to be harassed, drugged, assaulted, and raped at company events. Some defendants benefited financially from retaining the perpetrators and actively covered up their conduct. Others failed to respond in good faith to red flags notifying them of the company's rape culture.

The plaintiff claims that Bjorkman and Golden made eXp's controller, board chair, and CEO Glenn Sanford a lot of money. The company operates like a pyramid scheme. An agent who recruits another agent becomes the recruit's "sponsor," the

recruit is in the sponsor's "downline," and sponsors are compensated based on direct sales and on how much agents "in their downline" make. This structure incentivizes sponsors to retain top agents in their downline. Bjorkman and Golden were in Sanford's downline. So Sanford had an incentive to retain them.

The plaintiff claims that Sanford breached his duty of loyalty by actively covering up the rape culture at the company to retain the financial benefits he received from the perpetrators. The plaintiff also claims that the defendant directors breached their oversight obligations by failing to respond in good faith to numerous red flags that made them aware of the rape culture. The plaintiff further claims, based mainly on Sanford's actions, that a control group that included Sanford breached its oversight obligations.

The defendants moved to dismiss the complaint under Court of Chancery Rules 23.1 and 12(b)(6). This decision denies the motion as to Sanford and the director defendants but grants the motion to dismiss the plaintiff's novel claim for breach of oversight obligations against the control group. Reaching the conclusion as to Sanford requires revisiting whether workplace sexual misconduct can give rise to a corporate trauma sufficient to support a claim for breach of fiduciary duty. It can and does here, for a host of reasons grounded in well-settled principles of Delaware corporate law. In contrast, extending oversight duties to the control group invites the court to make new law. This decision declines that invitation.

# I. FACTUAL BACKGROUND

The facts are drawn from the Corrected Verified Derivative Complaint (the "Complaint") and documents it incorporates by reference.[1]

## A. The Company

Defendant Sanford founded eXp (or the "Company") in 2009 to provide cloud-based real estate services, mainly to residential homeowners. Its shares have traded on the NASDAQ since 2018. The Company's wholly owned subsidiary, eXp Realty, LLC, generates profits by serving as a licensed real estate broker.

### 1. The Board And Control Group

The Company's six-person board of directors (the "Board") manages its business and affairs.[2] The Board changed composition mid-way through the period covered by the Complaint. For most of that period, the Board comprised Sanford, eXp

---

[1] 2024-0998-KSJM Docket ("Dkt.") 7 ("Compl."). On a motion to dismiss, the court can consider documents that the complaint incorporates by reference, such as documents that the complaint quotes or cites. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013), *as corrected* (Oct. 8, 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n.17 (Del. Ch. Mar. 29, 2011))); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint; this is true even where the documents are not expressly incorporated into or attached to the complaint.").

[2] From 2019 to 2023, the Company's board comprised seven members. Compl. ¶ 73; Dkt. 32 ("eXp Opening Br."), Ex. 9 at 3. Although the Complaint states that the Board comprised seven members through 2023, this is inaccurate; sometime in 2023, the Board expanded to eight members, then reduced to seven when Eugene Frederick left the Board in May 2023. The Board then further reduced to six members in 2024. Dkt. 32 ("eXp Opening Br."), Ex. 11 at 17.

agent Eugene Frederick, former President of eXp Realty Jason Gesing, Randall Miles, Dan Cahir, and a person identified by the parties as the "Whistleblower." The Whistleblower also consulted the Company on diversity and inclusion efforts. Sanford is the Board Chair. As discussed further below, the Whistleblower was not put up for reelection and left the Board in September 2022. Non-party Monica Weakley filled the vacancy. Frederick left the Board in May 2023 and Gesing left the Board in January 2024. Non-parties Fred Reichheld and Peggie Pelosi replaced them.

Through a voting agreement dated December 17, 2020, Sanford and a group of eXp stockholders, which owned a combined 50% interest in eXp, committed to vote together on director elections and other matters.[3] The group comprises Sanford, his former spouse, Frederick, and Gesing (together, the "Control Group"). Frederick served on the Board from April 2016 through May 2023 and has been with eXp Realty since April 2015. Gesing served on the Board from September 2014 through January 2024 and was CEO of eXp Realty from May 2016 through July 2016 and from October 2019 through December 2022. Gesing also served as Company President from June 2014 through September 2016.

Control Group members held positions on key Board committees. Sanford alone comprised the Equity Committee, which has authority to make grants of common stock under the Company's 2015 Equity Incentive Plan.

---

[3] When the plaintiff filed the Complaint, the Control Group members' combined ownership was 45.5%.

## 2. The Business Model

Company agents are not employees—they are brought into eXp Realty under an "Independent Contractor Agreement."[4] Under the agreement, the Company earns a share of each agent's commissions. So do other agents, through a multi-level marketing model where agents are encouraged to recruit other agents. Top agents are called "Influencers" and often host recruitment events.[5]

An agent who recruits another agent becomes the recruit's "sponsor." The Independent Contractor Agreement defines the sponsor as the individual "who has been most influential in [the agent's] decision to join eXp Realty" and directs the joining agent to designate the sponsor.[6]

A sponsor does not have supervisory responsibilities but shares in a recruit's revenue. The recruits are placed in the sponsors' downline, sponsors are enrolled into the Company's revenue share program, and sponsors are compensated under the revenue share program based on revenue generated by their downline. After three years, sponsors become "Vested Participants" in the program, which means that they continue to earn money under the revenue share program even if they leave eXp.[7] Through that structure, eXp's revenue share program incentivizes sponsors to retain top agents in their downline based on their financial performance alone. Between

---

[4] Dkt. 32 ("eXp Opening Br."), Ex. 1 (Indep. Contr. Agr.).

[5] Compl. ¶¶ 1, 23.

[6] Indep. Contr. Agr. at eXp_1017.

[7] Compl. ¶ 21.

2018 and 2020, the Company revised its Independent Contractor Agreement to prohibit an agent from switching sponsors.

Sanford, Frederick, and Gesing received substantial payments under the revenue share program. In 2020, Sanford earned a bonus that was equal to his base salary, which was based on revenue share income generated during the last five months of 2020. Although Sanford stopped formally participating in the revenue share program, he continues to receive a quarterly cash bonus equal to the amount he would have received if he were still formally participating.[8] In 2020, Frederick received nearly $3.9 million in cash and stock through the revenue share program. In 2021, Gesing earned $545,506 through the program.[9]

### 3.    The Policies

The Company has a Code of Business Conduct and Ethics (the "Ethics Code") for its directors, officers, and employees.[10] The Ethics Code provides for anonymous reporting of potential or suspected violations of the Ethics Code or any laws that require reporting.[11] The Ethics Code prohibits retaliation. The Ethics Code states:

> The Company seeks to promote and maintain a culture of compliance with all Applicable Laws and the highest standards of business conduct. Everyone at the Company should promote this culture of compliance.
>
> [. . .]

---

[8] *Id.* ¶ 90.

[9] *Id.* ¶ 89.

[10] eXp Opening Br., Ex. 2 (Ethics Code).

[11] Ethics Code at eXp_0298–0299.

6

The Company is firmly committed to providing equal opportunity in all aspects of employment and will not tolerate any illegal discrimination or harassment of any kind. Examples of prohibited conduct include derogatory comments based on race, gender, ethnicity or sexual preference and unwelcome sexual advances.[12]

The Ethics Code includes a "Whistleblower Policy" to ensure compliance with Company rules. Under the policy, the Company maintains an anonymous hotline and webpage to collect responses.[13] Employees of eXp must report information regarding non-compliant financial reporting and disclosures but are not required under the policy to report other compliance matters.[14]

The Ethics Code does not apply to eXp agents, for whom eXp has a set of "Policies and Procedures."[15] Each Independent Contractor Agreement incorporates the Policies and Procedures and requires adherence to them.[16] The Policies and Procedures include a section titled "Code of Conduct," which requires all agents to conduct their business "in accordance with applicable federal and state laws" and "conduct themselves in an appropriate business-like manner in all activities and relations with fellow Agents, clients, potential customers and eXp staff."[17] The Code of Conduct further states:

It is the commitment of eXp to ensure the brokerage is free from negative, aggressive and inappropriate behaviors,

---

[12] *Id.* at eXp_0292, eXp_0297.

[13] *Id.* at eXp_0298–99.

[14] *Id.* at eXp_0296.

[15] eXp Opening Br., Ex. 3 (Policies and Procedures).

[16] Indep. Contr. Agr. at eXp_1018.

[17] Policies and Procedures at eXp_0352.

and that the environment is aimed at providing an atmosphere upholding our core values. All Agents and employees of eXp have the right to be treated with dignity and respect. All complaints of negative and inappropriate behaviors will be taken seriously and followed through to resolution. Agents or employees of eXp who file complaints will not be victimized for "whistle-blowing" or reporting others for their inappropriate behavior. Agents may file complaints by emailing compliance@exprealty.net.[18]

That section concludes: "Agents are subject to immediate termination for violation of the Code of Conduct."[19]

The Policies and Procedures contain a section titled "Harassment," which provides:

eXp takes all forms of harassment seriously. This includes but is not limited to verbal, physical or sexual. All reported or suspected occurrences of harassment will be promptly and thoroughly investigated. Any Agent that is found to have harassed another Agent, employee, client, customer or any member of the public shall be immediately, and without warning, released from eXp at eXp's sole discretion.

If an Agent feels they have been harassed in any way, the Agent shall notify the State Broker [i.e., the designated managing broker] or a member of the corporate team immediately.

eXp will not permit or condone any acts of retaliation against anyone who files harassment complaints or cooperates in the investigation of the same.[20]

The Company has devoted resources toward the compliance efforts. The Company has a dedicated Director of Agent Compliance. eXp Realty has a

---

[18] *Id.* at eXp_0353.

[19] *Id.*

[20] *Id.* at eXp_0407–08.

management-level Compliance Committee, whose members during the relevant period included (among others) the Director of Agent Compliance, the CEO of eXp Realty, the President of U.S. Growth at eXp Realty, and the Company's Chief Legal Counsel, Defendant James Bramble. The Compliance Committee meets every two weeks.[21] The Company also had a Cultural Integrity Group for moral and ethical violations, a Human Resources department, and a Global Operations Coordinator charged with writing policies and procedures. The Company had a Director of Diversity and Employee Success, who Plaintiff alleges was assigned as an escalation point for complaints of sexual misconduct.

Neither the Ethics Code nor the Policies and Procedures provide an express structure for escalating concerns of sexual misconduct to the Board.

### B.    Reports Of Rape And Sexual Assault

Influencers Bjorkman and Golden had worked with Sanford at another real estate firm before joining eXp. Bjorkman and Golden were in the downline of key eXp Influencer Brent Gove. All three were in Frederick's downline, and thus all three were in Sanford's downline. Sanford and Frederick benefited from the revenue generated by Bjorkman, Golden, Gove, and their downlines.[22]

---

[21] eXp Opening Br., Ex. 6 ("Agent Five Email Commc'ns.") at eXp_0823C.

[22] Frederick also worked closely with Gove in connection with significant eXp events, including 2024 events in Maui, Hawaii, and Cabo San Lucas. In one online webinar, Frederick touted that he and Gove "probably recruited more people in the Company" than any other Influencers. Compl. ¶ 97.

Bjorkman and Golden systematically harassed, drugged, assaulted, and raped agents at eXp events dating back to at least 2018. Dozens of other eXp agents participated in or knew of the conduct.

### 1. September 2020

Many of the survivors bravely began reporting the assaults in September 2020. Three eXp agents, who this decision refers to as Agents Two, Three, and Four,[23] alleged that Bjorkman and Golden drugged them and that Bjorkman raped them during an August 2020 recruitment event in Las Vegas.

Agent Two reported the incident in September 2020 to Golden, Gove, and a detective who later arrested Bjorkman. As alleged in the Complaint, however, Golden had participated in many of Bjorkman's assaults and Gove attended multiple events where Bjorkman and Golden drugged and assaulted women. Agent Two was not aware of Golden's or Gove's complicity when she reported the incident. Golden encouraged Agent Two to lie to the police.[24]

---

[23] The names of some of the survivors are public, but the court anonymizes their names here out of caution.

[24] Compl. ¶¶ 48–52.

10

Agent Three reported the assault and rape to the designated managing broker for Florida.[25]

Agent Four posted on Facebook that she had been drugged at the event. Hundreds of people commented on the post, including seven other women who stated that they too had been drugged and sexually assaulted at eXp events.[26]

Later that month, the Company terminated Bjorkman's contract with eXp Realty for "inappropriate behaviors" that violated Company policy.[27] Although he had been with eXp for less than three years, the Compliance Committee approved an "Accelerated Compensation Agreement" to ensure that Bjorkman's revenue share vested, and eXp continued to pay Bjorkman downline revenue under the revenue share arrangement. Bjorkman was also allowed to continue selling real estate with a small sales team.[28]

At the time, the Compliance Committee included Gesing, Chief Legal Counsel Bramble, President of U.S. Growth Dave Conord, and eXp's Director of Agent Compliance.[29] Gesing voted to provide Bjorkman with these benefits. Bramble voted

---

[25] *Id.* ¶ 61

[26] *Id.* ¶ 56.

[27] *Id.* ¶ 83.

[28] *Id.* ¶¶ 83–84.

[29] The Complaint identified Cory Haggard as Director of Agent Compliance in November 2020. It is unclear from the Complaint whether Haggard was in this position when the Company terminated Bjorkman.

11

to "[a]llow him to come back" to the Company "based on" Sanford's undisclosed "comments."[30]

If eXp tried to terminate *both* Bjorkman and Golden, Gove threatened to pull his entire team, which comprised roughly one-fifth of the Company's agents. As a compromise, Sanford agreed to terminate Bjorkman only.[31] Upon hearing that Agent Two wanted Golden to be terminated, Frederick commented: "we all know that's not going to happen."[32] Golden was allowed to continue at eXp.

### 2. October 2020

Reports of sexual assault continued through the fall of 2020. After learning of the crimes against other agents, Agent One called eXp's Director of Agent Compliance Haggard to report that Bjorkman had raped her in April 2019.[33] During that call, Agent One told Haggard that: (i) in 2019, Bjorkman told her to stay away from Golden because he would drug and rape her; (ii) Bjorkman had shown her videos of Golden in which Golden was completely naked and engaging in sexual acts with women; and (iii) an agent whom Bjorkman was trying to recruit at an event in February 2019 was

---

[30] *Id.* ¶ 84 (alterations in original).

[31] *Id.* ¶¶ 85–87.

[32] *Id.* ¶ 54.

[33] *Id.* ¶¶ 63–64.

drugged and transported to the hospital. Agent One requested a new sponsor so that she would no longer be in Golden's or Bjorkman's downline.[34]

Also in October 2020, one of eXp's top agents anonymously sent an eleven-page memorandum to Gesing, Haggard, and Conord detailing Bjorkman's and Golden's sexual assaults.[35] Gesing was on the Board at the time. The Complaint alleges that Sanford personally reviewed the October 2020 memorandum and took no action.[36]

The memorandum explained that Bjorkman and Golden assaulted women together. Their modus operandi was to travel to events together, drug female agents and recruits to incapacitate them, record the agents and recruits while they appeared inebriated, and then sexually assault them. According to the memo, Bjorkman and Golden used the recordings to coerce the women into remaining silent. The author reported that she and her spouse had been drugged and sexually harassed by Bjorkman and Golden at a recruiting event. The author describes several sexually explicit videos she received from two other eXp agents. The author also detailed numerous incidents of Bjorkman's and Golden's behavior that the author had

---

[34] *Id.*

[35] eXp Opening Br., Ex. 4 ("Anonymous Memorandum"); *id.*, Ex. 5.

[36] *See* Compl. ¶ 68.

personally witnessed throughout 2019. The author stated that other eXp agents joined in the sexual assaults.[37]

The memorandum explained that, in the spring of 2020, the author reported the incidents to Gove and another agent in Bjorkman's upline, but they dismissed the author's concerns.[38]

### 3. November 2020

On November 2, 2020, the Audit Committee held a meeting. The committee members included Sanford, Cahir, and Miles, with Miles as Committee Chair. General Counsel Bramble also attended the meetings. Miles asked the attendees if they were aware of any material allegations of discrimination. Sanford, Cahir, and Bramble stated that they were unaware of any material allegations.[39] The minutes contain no record of discussion regarding any sexual misconduct. Either those issues were not discussed or that discussion was intentionally omitted from the minutes.[40]

On November 9, 2020, Agent Three followed her September 2020 report with a seven-page written statement to Haggard describing her assault and rape. In that statement, Agent Three said that she had spoken to eleven other people, including eXp agents, who had similar experiences.

---

[37] Anonymous Memorandum at 1–11.

[38] *Id.*

[39] eXp Opening Br., Ex. 13 (Nov. 2, 2020 Audit Committee Mtg. Minutes) at eXp_0692–93.

[40] *Id.*

### 4. March 2021

In 2021, an eXp agent wrote an email to the entire Board, which included Defendants Sanford, Miles, Cahir, and Gesing.[41] The letter disclosed that the agent was sexually assaulted by another eXp agent and requested an official change of sponsorship. The Whistleblower also received several calls and text messages from eXp agents, all reporting that they had been drugged and sexually assaulted by Bjorkman or Golden.[42] The Whistleblower raised these issues with the Board.[43]

On March 8, 2021, the Audit Committee held a meeting. Sanford, Miles, Cahir, and Bramble attended. The minutes contain no record of discussion of sexual misconduct at the Company.[44] That same day, Bjorkman was arrested for sexually assaulting an eXp agent.

### 5. May And June 2021

The Audit Committee met on May 4, 2021. The Board met on June 4, 2021. According to the Complaint, the minutes of these meetings contain no record of discussion of Bjorkman's and Golden's sexual assaults, the March 2021 email reporting those assaults, or Bjorkman's March 2021 arrest.[45] Either those issues were not discussed or that discussion was intentionally left out of the meeting minutes.

---

[41] Compl. ¶ 109.

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶ 58.

[45] *Id.* ¶ 101; eXp Opening Br., Ex. 14 (June 4, 2021 Board Mtg. Minutes) at eXp_0722.

### 6. August And September 2021

Bjorkman was arrested again in August 2021, this time in Miami-Dade County.[46] On September 10, 2021, eXp announced that Dave Conord, eXp Realty's Head of U.S. Growth and a member of the Compliance Committee, was retiring. The Whistleblower and other Board members approved Conord's compensation package within two days.[47]

### 7. December 2021

In December 2021, months after the Board approved the severance package, Miles told the Whistleblower that Conord had not retired. Rather, he had been asked to leave because he had been having an affair with a subordinate and sending sexually explicit pictures to subordinates to pressure them into having sex with him. Miles also told the Whistleblower that this information was "hush hush."[48] The Whistleblower explained that she approved Conord's compensation package based on her understanding that Conord was retiring, and that she would not have approved it had she known the real reasons for Conord's departure.

Miles also told the Whistleblower that Conord was in a hotel room where women were being drugged and sexually assaulted, confirming that Miles knew by then about both the sexual misconduct and Conord's personal involvement.[49] Miles stated his opinion that Conord made a mistake by *being* in that hotel room, not by

---

[46] Agent Five Email Commc'ns. at eXp_0823C.

[47] Compl. ¶ 104.

[48] *Id.*

[49] *Id.* ¶ 103.

failing to report the misconduct. Miles thought that, as a married man, Conord should have known better than to stay in the hotel room past 11:00 p.m., which was generally known as the time where attendees were locked in the room and not allowed to leave until the next morning.[50]

The Company welcomed Conord back in early 2022, less than four months after the Company announced his departure. In a Friday afternoon announcement, Sanford and Gesing shared the news of Conord's return to eXp, saying, "Guess who's back. The man is back."[51]

### 8. March 2022

In March 2022, Agent Five reported that Bjorkman had drugged her in July 2018. She reported that multiple women suspected that they were drugged at an eXp event in October 2018. And she reported that in September 2019, Bjorkman "placed a roofie in [her] hand and asked [her] to take it."[52] Agent Five told Golden what happened the night it happened, but he ignored her.[53]

Agent Five reported this orally to Sanford on March 7, 2022, who requested that she forward emails reporting this behavior to him.[54] He confirmed receipt. She then emailed an eXp compliance officer on March 23, 2022, to provide details on three

---

[50] *Id.* ¶¶ 31, 103.

[51] *Id.* ¶ 105.

[52] Agent Five Email Commc'ns. at eXp_0825C–26C.

[53] *Id.* at eXp_0826C.

[54] Compl. ¶ 111; Agent Five Email Commc'ns. at eXp_0822C.

incidents of reported drugging and request a sponsorship change.[55] Bjorkman was Agent Five's sponsor and made money from her sales.

### 9. April 2022

On April 5, 2022, an eXp compliance officer left Agent Five a voicemail stating that Agent Five's request to change sponsors had been denied.[56] The next day, Agent Five spoke with the compliance officer, who agreed to escalate the request to eXp's Compliance Committee.[57] The description of Agent Five's request contained in the minutes from the Compliance Committee meeting tracks the information provided in the March 23, 2022 email and subsequent messages in the email chain between Agent Five and eXp's compliance department.[58]

On April 18, as Agent Five waited for a response from the Compliance Committee, she emailed the compliance officer and raised Bjorkman's August 2021 arrest. She also raised Golden's continued employment at the Company, and the "silence" of other eXp insiders who had the "full support" of "upper management [and] board members."[59] Some of the "eXp insiders" who Agent Five named in her email had already been identified in the October 2020 memorandum sent by a top eXp agent to Conord, Haggard, and Gesing. The memorandum stated that those "insiders" sent

---

[55] *Id.* ¶ 112.

[56] *Id.* at eXp_0825C.

[57] *Id.* at eXp_0824C–25C.

[58] *Compare* Defs.' Opening Br., Ex. 7 ("May 3, 2022 Minutes") at eXp_1540, *with* Agent Five Email Commc'ns. at eXp_0825C–26C.

[59] Agent Five Email Commc'ns. at eXp_0822C.

sexually explicit videos to eXp agents and participated in Bjorkman's illegal conduct.[60]

That same day, the compliance officer told Agent Five that the Compliance Committee denied her request.[61] The compliance officer stated that the Independent Contractor Agreement provides that "sponsor selection shall be permanent and may not change."[62]

Agent Five responded on April 20, 2022, copying Sanford, Gesing, Cahir, the Whistleblower, and the eXp agent who she had selected as her new sponsor. Agent Five included all of the prior emails on the chain. Sanford, Gesing, Cahir, and the Whistleblower thus received all of Agent Five's previous emails to the compliance department, which included the following statements:

> July 20th, 2018 . . . : Closing table . . . This is the first time I got so sick from one drink that I could barely walk, throwing up all over and was feeling dizzy and ill.
>
> [ . . .]
>
> October 22-24, 2018 eXpCon Nola 2018. Multiple women reported the next morning and shared with me the same effects of feeling drugged, dizzy and throwing up. Many of these women are no longer with the company. However there are a few who are still operating under eXp including myself.
>
> [ . . .]
>
> September 23rd-25th 2019 FiveStar Conference Dallas, Texas. Rosie Rodriguez, Mike Bjorkman, David Golden sponsored a suite. As a new agent, we are encouraged to

---

[60] *See* Anonymous Memorandum.

[61] Agent Five Email Commc'ns. at eXp_0822C.

[62] *Id.*

bring non eXp agents to get enrolled and learn about the company. This is the day where Mike Bjorkman placed a roofie in my hand and asked me to take it . . . . That night, I communicated to [Golden] what happened and he disregarded my comment.[63]

In her email to the Board, Agent Five states that she was drugged and that "sexual harassment" is "real" and "is not something we should take lightly, hide or uncover [sic]."[64] She explains that "Rohypnol[,] the rape drug" had become part of "the eXp corporate culture."[65] She also requested that eXp provide guidance on "who to contact in case of any sexual abuse [or] drug poisoning" at eXp.[66]

By April 2022, the Whistleblower had received reports from 20 agents detailing numerous sexual assaults. The Whistleblower sought advice from the Company's outside counsel, a law firm in Dallas, about the Board's failure to address the reports of sexual misconduct. Outside counsel provided numerous recommendations, including that the Board authorize an independent investigation.[67]

The Whistleblower sent a message to her fellow directors through a Board portal sharing outside counsel's recommendations. The recipients included Sanford, Miles, Cahir, Gesing, and Frederick. The Whistleblower wrote:

> As you know, I have a unique role within the company. I serve as both a Director and Leader of Diversity and Inclusion for eXp. *You all have now been made aware that there [have] been several serious allegations made against*

---

[63] *Id.* at eXp_0825C–0826C (cleaned up).

[64] *Id.* at eXp_0820C.

[65] *Id.*

[66] *Id.* at eXp_0826C.

[67] Compl. ¶ 123.

*senior leaders of our team* that require the utmost in independence as well as sensitivity to address. While I am sure as a company we have tried to address these concerns, they are at a level which requires an independent view in order to protect both the company and the alleged victims. To date, *there have been three women who have come forward with similar allegations regarding being drugged and or sexually assaulted by a former agent(s) with possibly more to come.* This strengthens the need for an investigation as to lessen the risk for the company.

*From the outside, the internal process that has been used to investigate the claims will likely be perceived as lacking independence. (Foxes guarding the hen house approach).* For the protection of the company, these cases should be reviewed and investigated outside the company by a national reputable law firm with subject matter expertise in these matters. Besides independence, the concern that I have about the approach that has been taken is that we are not taking a long term view. The ruling to deny [Agent Five] change of sponsorship is short-sighted and has long term implications to the alleged victim as well as potential damage to the company culture and brand.

Furthermore, the same request from other alleged victims was granted, which results in an inexplicable inconsistency in the conclusions.

I have given this serious thought as I have a unique perspective, role and in a position to provide insights to you. I also join you as a fiduciary with legal, and ethical responsibility to protect our company/agents/shareholders.

Based on the multiple conversations and correspondence that has been shared with me over the last few weeks by these women, it was made clear to me that they are not going away quietly. The likelihood that these incidents will be reported to the media or as a legal challenge increases daily. It may not be tomorrow, next year, or in 5 years, however, it will become public at some point as many people inside and outside of eXp are aware of these incidents.

*The takeaway is that some of the women in this company don't feel heard or protected.* While the potential brand

damage if this does become public is incalculable, together as a Board we have an ethical responsibility to the alleged victims.

I spent the Easter holiday weekend and majority of this week listening to the insidious details of what [Agent Five] and other women who have made allegations against both Michael Bjorkman *and David Golden*. From what has been communicated to me, there are multiple victims that are surfacing with the same story who don't know each other. While some have already left the company, others who have *not come forward out of shame, fear of being bullied and retaliated against by leaders in their rev share organization* as was reported in the correspondence (see text messages). As of last week, some of these women (and men) are now coming together and sharing information- in light of the bombshell lawsuit reported in INMAN news against our competitor Keller Williams Realty which impacted the Founder, former CEO, former President, and other key leaders. *For exp, this appears to be more than just a few agents behaving badly*.

My recommendations follow:

Action 1: We should immediately launch an independent investigation done by a credible law firm to assess the situation and provide recommendations. This could lead to other information being discovered where there is credible evidence of further assaults, cover ups, bullying or participation in the activities. If this occurs we will need to carefully address necessary actions.

Action 2: Change the sponsorship for any of the alleged victims who come forward with credible information to address concerns

Action 3: Proactively create both an internal and external statement supporting a zero tolerance policy for sexual harassment, misconduct or abuse of women. (and men)

Action 4: Create an independent "whistleblower hotline/process" for staff and agents to confidentially report sensitive issues.

Action 5: Review and amend the "revenue share for life" policy that would prohibit agents/staff that have been terminated for cause from the company to continue to financially benefit from rev share, etc.

Action 6: Encourage an environment of inclusion by having leadership reach out to the agents and listen to their concerns on a regular basis

Action 7: As both a gesture of goodwill and a proactive approach towards women in the company, adopt and fund the new women's leadership initiative that will (in partnership with men) foster, re-establish trust via peer to peer mentoring, business innovation, and a commitment to sponsor new female licensees.

I want to thank each of you in advance for your support for a more diverse, inclusive and safe environment for all eXp agents, employees and recruits.[68]

The Board did not adopt any of the Whistleblower's recommendations.[69] Instead, after the Whistleblower sent her message, the Board instituted the "Fox guarding the hen house approach" that outside counsel advised against by launching an internal investigation led by a team of five eXp employees, including two officers.[70]

Sanford, attempting to minimize the issue, told the Whistleblower that "this was not their problem and would be simply a three-to-five day newspaper phenomenon and then would disappear."[71]

---

[68] eXp Opening Br., Ex. 10 ("Whistleblower Commc'n.") (emphases added).

[69] CEO Gesing later told Agent Five that she would be permitted to change sponsors and "offered to cover 12 months of her mortgage payments," in response to her assertions of hardship. Compl. ¶ 118.

[70] Compl. ¶ 123.

[71] *Id.* ¶ 122.

According to the Complaint, the Whistleblower raised these issues at two Board meetings. She described reports she received of rape, sexual assault, and drugging.[72] Her reports were not recorded in the meeting minutes.[73] And at least twice in response to her reports, Board members including Sanford and Miles told her—a director and Company diversity and inclusion consultant—to mind her business.

### 10. May 2022

The first mention in any Board or Committee minutes of the drugging, rape, or sexual assault allegations appears in the May 3, 2022 Compliance Committee minutes.[74] This is the case even though the Compliance Committee meets every two weeks, met in April to review Agent Five's sponsorship change request, and denied that request on April 18, 2022.

The May 3, 2022 Compliance Committee meeting occurred after Agent Five emailed Sanford, Gesing, Cahir, and the Whistleblower on April 20. The May 3 minutes describe Agent Five's sponsorship change request as a "Policy Exception Request."[75]

The descriptions of the "Request Details" state: "[Agent Five] stated that she shared with a member in her upline that she was drugged in the past during a conference and that she was once offered a roofie by Michael Bjorkman. After sharing

---

[72] *Id.* ¶ 124.

[73] *Id.* ¶¶ 99–102.

[74] Compl. ¶ 114; May 3, 2022 Compliance Committee Minutes at eXp_1540.

[75] *Id.*

this information, she feels her upline agents are no longer supporting her agent attraction efforts."[76]

That section further notes that "[a]llowing the change would move [Agent Five] to a completely new revenue share line, causing potential negative impact to six eXp agents, *and Michael Bjorkman who is in vested retirement status*."[77]

Although the "Request Details" mention financial impact *to Bjorkman*, they omit any discussion of Agent Five's references to "sexual abuse," eXp's rape drug– fueled "corporate culture," or Agent Five's repeated attempts to alert agents in her upline about her experience.[78]

The minutes report that the Compliance Committee denied Agent Five's request "pending conversation" with Holly Maybery, a member of the Compliance Committee.[79] After that "conversation," Jim Nuth, another committee member, would "discuss the issue with the audit committee."[80]

### 11. June 2022

Miles and Bramble informed the Whistleblower that she was being put on "whistleblower status," and that there would be a backlash because of the Whistleblower's actions.[81] Before the Whistleblower came forward about the sexual

---

[76] *Id.*

[77] *Id.* (emphasis added).

[78] *Id.*

[79] *Id.* at eXp_1540, eXp_1543.

[80] *Id.*

[81] Compl. ¶ 125.

25

misconduct reported to her and urged the Board to act, the Whistleblower had been asked to stay on the Board.[82]   After, the Governance Committee, which included Miles, decided not to put the Whistleblower up for re-election.[83]   The Whistleblower's term expired in June 2022.

### C.    The Federal Suits And Media Coverage

By early 2023, the Board's response to reports of rape and sexual assault had been limited.  To recap, in September 2020, the Board terminated Bjorkman's agent contract but allowed him to continue to earn revenue in retired status.  The Board also declined to terminate Golden, allegedly as a compromise to appease Gove and potentially others.   And around April 2022, the Board launched an internal investigation that did not conform to outside counsel's recommendations, but the Board did not change anything.  Beginning in February 2023, the sexual misconduct at eXp prompted three suits in federal court and a New York Times exposé.

### 1.    The First Anti-Trafficking Suit

On February 22, 2023, four eXp agents filed *Acevedo v. eXp World Holdings, Inc. et al.* against eXp, Bjorkman, Golden, Gove, and Sanford in California federal court (the "*Acevedo* Action").  The plaintiffs in the *Acevedo* Action assert claims under federal anti-trafficking laws, as well as state-law claims for sexual and civil battery, intentional infliction of emotional distress, and negligence.[84]

---

[82] *Id.*

[83] *Id.*

[84] *Id.* ¶ 128.

The day after survivors filed the first lawsuit, the Board suspended Golden's status as an agent. Golden had qualified for revenue share vesting days before. The Company continues to pay Golden under the revenue share agreement.

### 2. The Second Anti-Trafficking Suit

On December 14, 2023, an eXp agent filed *Roberts v. eXp Realty, LLC et al.* in California federal court against eXp and Sanford (the "*Roberts* Action"). The agent asserts claims for beneficiary liability under federal anti-trafficking laws, as well as state-law claims for negligent hiring, retention, and supervision.[85]

### 3. The New York Times Publishes *Drugged And Assaulted.*

On December 15, 2023, *The New York Times* published an exposé on sexual assault, rape, and drugging at eXp.[86] Titled *Women at Fast-Growing Realty Firm Say They Were Drugged and Assaulted*, the exposé drew from "more than 30 interviews with current and former eXp agents," where women said "high earners are granted star status, and allegations of misconduct are ignored."[87] The exposé quoted one former eXp broker as saying that the brokers "that grow their teams the fastest are the center of attention for the company . . . . [a]nd unfortunately, it's like they can do no wrong."[88]

---

[85] *Id.* ¶ 134.

[86] *Id.* ¶ 135 (discussing Debra Kamin, *Women at Fast-Growing Realty Firm Say They Were Drugged and Assaulted*, N.Y. Times (Dec. 15, 2023), https://www.nytimes.com/2023/12/15/realestate/sexual-misconduct-exp-realty.html.).

[87] Kamin, *supra.*

[88] *Id.*

### 4. The Third Anti-Trafficking Suit

On January 16, 2024, a former eXp agent filed *Carter v. Chris Nevada et al.* in Nevada federal court against eXp agent Chris Nevada and the Company (the "*Carter* Action"). The former agent claimed that Nevada offered to pay her for sex and inappropriately touched her and other agents. The defendants in the *Carter* Action, including eXp, agreed to settle the claims. The terms of the settlement are not public.

### 5. A California Federal Court Sustains The First Anti-Trafficking Suit.

On January 29, 2024, the California federal court issued an 85-page decision largely denying the defendants' motion to dismiss the *Acevedo* Action. The court held that the eXp agents met their burden of pleading facts creating a plausible inference that: "Sanford and Gove are beneficiaries of Bjorkman's sex trafficking" through the revenue share program.[89] According to the federal complaint, Sanford, Gove and eXp "attempted to cover up a previous instance or allegations of sexual assault."[90] The allegations supported an inference that "the eXp Leadership Team had a longstanding culture—their pattern and practice—of creating an environment that allowed these assaults, then silencing those whose accounts of sexual harassment and assault would impact profit."[91]

---

[89] *Acevedo v. eXp Realty, LLC*, 713 F.Supp.3d 740, 784 (C.D. Cal. 2024).

[90] *Id.* at 784 (citation modified).

[91] *Id.* at 793 (citation modified).

**D.    This Litigation**

Plaintiff Los Angeles City Employees' Retirement System owns stock in eXp. Plaintiff filed this action on October 8, 2024, against Sanford, Miles, Cahir, Gesing, Frederick, and Bramble (collectively, "Defendants"), claiming that they breached their fiduciary duties.

The Complaint contains four counts. In Count I, Plaintiff claims the Control Group breached oversight obligations.[92] In Count II, Plaintiff claims that Sanford breached his fiduciary duties as a director and officer.[93] In Count III, Plaintiff claims that Frederick, Gesing, Miles, and Cahir breached their fiduciary duties as directors.[94] And in Count IV, Plaintiff claims that Bramble breached his fiduciary duties as an officer.[95]

The allegations and legal theories underlying each of the four counts are similar. Plaintiff claims that each Defendant violated his obligations under *Caremark* by "failing to ensure that the Company had in place reasonable reporting and information systems that would have allowed eXp's officers and the Board to know about and prevent acts of sexual assault and misconduct, and failing to respond to and consciously disregarding the accounts of sexual assault and misconduct that were brought to the [Defendant's] attention."[96]

---

[92] Compl. ¶¶ 173–79.

[93] *Id.* ¶¶ 180–86.

[94] *Id.* ¶¶ 187–93.

[95] *Id.* ¶¶ 194–200.

[96] *Id.* ¶¶ 176, 182, 189, 196.

Plaintiff also claims that Sanford "covered up the sexual misconduct at eXp; caused the Company to enter the 'Accelerated Compensation Agreement,' under which it paid out at least $1 million to Bjorkman; and rushed Conord's compensation package through a Board vote, while withholding material information about the reason for his departure that would have affected other Board members' decisions to approve or reject his compensation."[97]

Plaintiff claims that the alleged cover-up allowed Sanford, Gesing, and Frederick to continue reaping profits from the revenue share program, citing Sanford's, Gesing's, and Frederick's 2020 and 2021 revenue share program awards.[98]

Defendants moved to dismiss the Complaint on December 10, 2024.[99] The parties fully briefed the motion and the court heard oral argument on July 28, 2025.[100] On January 6, 2026, the court granted the parties leave to submit supplemental briefing on the implications, if any, of a December 2025 decision of this court, *Brola ex rel. Credit Glory Inc. v. Lundgren*.[101] The parties completed supplemental briefing on January 14, 2026.[102]

---

[97] *Id.* ¶¶ 176, 182, 189.

[98] *Id.* ¶¶ 89, 176, 182, 189.

[99] Dkts. 26–31.

[100] Dkt. 68.

[101] --- A.3d ---, 2025 WL 3439671 (Del. Ch. Dec. 1, 2025); *see* Dkt. 72.

[102] Dkt. 74 ("Defs.' Supp. Br."); Dkt. 75 ("Pl.'s Supp. Br.").

## II.  LEGAL ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1.  Defendants have also moved to dismiss Counts I and III under Rule 12(b)(6).[103]  Because aspects of the Rule 23.1 analysis build on the Rule 12(b)(6) analysis, this decision begins with the Rule 12(b)(6) motion.

### A.  Rule 12(b)(6)

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[104]  When considering a motion under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[105]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[106]

Delaware law distinguishes between (i) wrongdoing based on active, self-interested conduct that harms the corporation, such as "committing acts of sexual

---

[103] No defendant has moved to dismiss Count II or IV under Rule 12(b)(6) against Sanford or Bramble.  So Defendants concede that these counts state claims under Rule 12(b)(6).

[104] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[105] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[106] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018)(citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

harassment,"[107] "a conscious decision to mislead,"[108] or "affirmative involvement in [an] alleged . . . cover-up,"[109] and (ii) wrongdoing based on a failure of oversight.[110] Both are loyalty claims, but the former is more overt than the latter. That is because oversight liability stems from passive (but conscious) failures to act—the notion that "directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance."[111]

Plaintiff here asserts claims based on both types of wrongdoing—active misconduct and oversight failures. Through Count II, Plaintiff alleges that Sanford

---

[107] *In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 381 (Del. Ch. 2023).

[108] *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *13 (Del. Ch. Aug. 31, 2016) (contrasting oversight claim alleging directors' "failure to oversee risk" versus a "fundamentally different" claim alleging that directors "made a conscious decision to mislead regulators in violation of positive law").

[109] *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 2016 WL 2908344, at *10 n.49 (Del. Ch. May 13, 2016), *supplemented*, 167 A.3d 513 (Del. Ch. 2017) (distinguishing between "allegations that the directors lack disinterestedness because of potential *Caremark* liability for consciously failing to monitor" and allegations of "the directors' affirmative involvement in [an] alleged bribery scheme and cover-up").

[110] *See McDonald's*, 289 A.3d at 380 (distinguishing between Fairhurst's acts of harassment that gave rise to a claim for breach of the duty of loyalty and Fairhurst's failure to establish an information system); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (distinguishing between when "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation" and when the fiduciary "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties") (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)); *see also In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (distinguishing between a "board decision" that results in harm and an "unconsidered failure of the board" that results in harm).

[111] *Caremark*, 698 A.2d at 967.

engaged in self-serving behavior by covering up the wrongdoing and ousting the Whistleblower. Through Count III, Plaintiff alleges that each of the Defendants breach their oversight obligations. And through Count I, Plaintiff alleges that the Control Group members breached oversight obligations.[112]

### 1. Claim That Sanford Actively Breached The Duty Of Loyalty

The analysis of Plaintiff's claim against Sanford begins with the governing legal standard, moves into a discussion of the recent *Credit Glory* decision, and concludes by applying the standard.

### a. Applicable Legal Principles

Although "[t]he standard of loyalty is measured by no fixed scale," a director's duty of loyalty "requires an undivided and unselfish loyalty to the corporation" and "demands that there shall be no conflict between duty and self-interest."[113] "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."[114]

A fiduciary acts in bad faith when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation."[115] "It

---

[112] Although Count II is pled against Sanford only, Plaintiff argued in briefing that Miles also actively breached his fiduciary duties. Because Count III states a claim against Miles, this decision does not address Plaintiff's argument that Miles also breached his fiduciary duties through active misconduct.

[113] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[114] *Id.*

[115] *Stone*, 911 A.2d at 369 (quoting *Disney*, 906 A.2d at 67).

33

makes no difference the reason why the [fiduciary] intentionally fails to pursue the best interests of the corporation."[116]

"Bad faith can be the result of any emotion that may cause a [fiduciary] to intentionally place his own interests, preferences or appetites before the welfare of the corporation."[117] "Bad faith is 'not simply bad judgment or negligence,' but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'"[118] "Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride."[119]

Covering up a breach of fiduciary duty is a form of disloyalty because it is an intentional act not in the best interests of the corporation. When a director knows of a wrong, and subsequently conceals that wrong or lies about it, that "deception is disloyal conduct in breach of his duty as a fiduciary."[120]

[116] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *27 (Del. Ch. Apr. 14, 2017) (cleaned up).

[117] *Id.* (quoting *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.)) (cleaned up).

[118] *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005) (TABLE) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993)).

[119] *RJR Nabisco,* 1989 WL 7036, at *15.

[120] *Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007); *cf. Lebanon Cty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *20 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020) ("A claim that directors had notice of serious misconduct and simply brushed it off or otherwise failed to investigate states a claim for breach of duty."); *Hoover Indus., Inc. v. Chase,* 1988 WL 73758, at *2 (Del. Ch. July 13, 1988) ("A director does breach his duty of loyalty if he knows that the company has been defrauded and does not report what he knows to the board or to

Directors and officers breach the duty of loyalty when they abuse human resources, including by sexually harassing employees or agents of the corporation, as this court held in *McDonald's*.[121]

*McDonald's* arose from the misconduct of the company's Chief People Officer, David Fairhurst, who allegedly fostered a corporate culture that condoned sexual harassment and misconduct. The complaint claimed that Fairhurst and the company's CEO turned the company's headquarters into a den of iniquity, where executives hosted weekly happy hours and routinely made female employees feel uncomfortable. Their conduct led to more than a dozen complaints with federal regulators, a walkout in over thirty cities to highlight the complaints, and a one-day strike to protest sexual harassment and the company's failure to address it. Amid this national corporate crisis over McDonald's toxic work culture, Fairhurst allegedly got drunk at a holiday party and harassed a female employee.

After the holiday party, the company docked Fairhurst's bonus by 50% and gave him one last chance. Fairhurst then worked with the general counsel and the board on corrective measures. Fairhurst later left the company after the board learned of a relationship between Fairhurst and an employee that violated the company's anti-fraternization policy.

---

an appropriate committee of the board, at the very least when he is involved in the fraud and keeps silent in order to escape detection.").

[121] *See McDonald's*, 289 A.3d at 380 ("[F]iduciaries violate the duty of loyalty when they engage in harassment themselves." (quoting Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 Colum. L. Rev. 1583, 1641 (2018)).

The work culture issues that Fairhurst fostered resulted in: the above-described walk-out and strike; a proxy battle to change the composition of the board; and a class-action lawsuit in Florida seeking damages for sexual harassment, retaliation, and related misconduct. In addition, the company initiated a suit against the CEO to claw back some of his severance package.

In this court, stockholders filed derivative claims against Fairhurst and members of the McDonald's board of directors to recover for the harm to the company resulting from a corporate culture that condoned sexual harassment and misconduct. The complaint asserted a duty of loyalty claim against Fairhurst and oversight claims against Fairhurst and the director defendants. The defendants moved to dismiss the complaint under Court of Chancery Rules 12(b)(6) and 23.1. The court addressed the motions in three decisions.

The court first tackled Fairhurst's Rule 12(b)(6) motion. Most of that decision focused on clarifying that officers owe oversight duties under *Caremark*. Germane to this discussion, the court addressed the plaintiffs' claim that Fairhurst acted disloyally through his own acts of harassment. The court concluded that "[i]t is not reasonable to infer that Fairhurst acted in good faith and remained loyal to the Company while committing acts of sexual harassment, violating company policy, violating positive law, and subjecting the company to liability. It is reasonable to infer that Fairhurst acted disloyally and for an improper purpose, unrelated to the

best interests of the Company."[122]  On this reasoning, the court denied Fairhurst's Rule 12(b)(6) motion.

In a second decision, the court granted the director defendants' Rule 12(b)(6) motion.  The court held that the complaint did not adequately allege a *Caremark* claim against the director defendants.  Although it was reasonably conceivable that the director defendants learned of numerous red flags revealing the culture of sexual harassment and Fairhurst's own misconduct, the court held that "the complaint does not support [] an inference that the Director Defendants failed to respond" to the red flags.[123]  The decision catalogued the board's numerous salutary actions intended to ameliorate the problem once it was surfaced to them.

In a final decision, the court granted the defendants' Rule 23.1 motion.[124] Because the complaint did not state a claim against the director defendants, the majority of the board did not face a substantial likelihood of liability in connection with the lawsuit and was not otherwise conflicted.  The court thus concluded that the plaintiff failed to plead demand futility.  The effect was that the entire case was dismissed, even the claim against Fairhurst.

The three *McDonald's* decisions demonstrate that sexually harassing employees can constitute a breach of the duty of loyalty, albeit one that might not survive a motion to dismiss under Rule 23.1.

---

[122] *Id.* at 381.

[123] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 662 (Del. Ch. 2023).

[124] *In re McDonald's Corp. S'holder Deriv. Litig.*, 2023 WL 2329711 (Del. Ch. Mar. 01, 2023).

### b. *Credit Glory*

A recent decision—*Credit Glory*—takes a different approach. There, a stockholder sued on behalf of a company for the harm the company suffered when it was held liable for $1.6 million for sexual harassment committed by one of its officers. The stockholder sought to shift the loss from the company to the offending officer by asserting a derivative claim against the officer for breach of the duty of loyalty. The court dismissed the claim, reasoning that interpersonal misconduct like sexual harassment governed by employment law cannot support a claim for breach of fiduciary duty.[125]

*Credit Glory* is distinguishable from this action. Plaintiff here does not assert a legal claim based on the theory that sexually harassing employees constitutes a breach of the duty of loyalty. Rather, the active misconduct here is the cover-up and retaliation. Yet *Credit Glory* can be interpreted as counseling against: relying on Delaware corporate law as a "general morality code;"[126] derivative claims arising from "workplace disputes . . . regulated by comprehensive state and federal laws;"[127] and "allowing a stockholder to capitalize on a victims' personal traumas."[128] Defendants

---

[125] *Credit Glory*, 2025 WL 3439671, at *5.

[126] Defs.' Supp. Br. at 2 (quoting *Credit Glory*, 2025 WL 3439671, at *4).

[127] *Id.* at 3.

[128] *Id.* at 4.

thus argue that the decision has potential implications for and supports their dismissal motions.[129] *Credit Glory*, therefore, warrants discussion.

The defendant in *Credit Glory* was Christopher Lundgren, a director and officer of the company. Two company employees sued Lundgren for discrimination in New York state court. The employees also named Credit Glory as a defendant. The New York court entered judgment against Credit Glory and Lundgren jointly for $1.35 million, and against Credit Glory and Lundgren individually for $235,000 each. Excluding attorney's fees and expenses, therefore, Lundgren's offenses against company employees rendered Credit Glory liable for $1.6 million.[130]

Company co-founder, president, and director Alex Brola filed a derivative claim on Credit Glory's behalf to recover the $1.6 million. Brola did not assert oversight claims. Rather, Brola claimed that Lundgren actively breached the duty of loyalty by sexually harassing company employees. Lundgren moved to dismiss on various grounds, including under Rules 23.1 and 12(b)(6). He argued that even though he and Brola were the only directors, demand was not futile because he did not face a substantial likelihood of liability from the claims against him. The court granted Lundgren's motion, reasoning Lundgren did not face a substantial likelihood of liability because harassing company employees is interpersonal conduct, governed by employment law, and cannot support a claim for breach of fiduciary duty.[131]

---

[129] *See generally id.* (arguing that *Credit Glory* has implications on and supports the motions to dismiss).

[130] C.A. 2024-1108, Dkt. 1.

[131] *Credit Glory*, 2025 WL 3439671, at *5.

The decision advanced six lines of reasoning.[132]   The first two addressed *McDonald's*.  The court reasoned that, if read to support the notion that sexually harassing company employees supports a claim for breach of the duty of loyalty, then *McDonald's* constitutes an expansion of Delaware law (the "expansion" argument). The court next reasoned that reading *McDonald's* to support a claim for breach of fiduciary duty based on interpersonal conduct could lead to "doctrinal sprawl" (the "sprawl" argument).  The third line of reasoning was that employment law preempts fiduciary duty claims (the "preemption" argument).  The fourth was that Delaware courts should show "comity" to the employment law of other states (the "comity" argument).  The fifth line of reasoning was that to support a fiduciary claim, the challenged conduct must involve fiduciary powers exclusively and cannot arise from powers that "any midlevel manager" might hold (the "powers" argument).[133]   Last, the court reasoned that treating sexual harassment as a basis for fiduciary violations would be detrimental to survivors of sexual abuse and thus against public policy (the "policy" argument).

### i.      The Expansion Argument

To build the argument that *McDonald's* constituted an expansion of Delaware law, *Credit Glory* reduced the holding of *McDonald's* to a syllogism: "[B]ecause sexual harassment is selfish, and selfishness is disloyal, then harassment is a breach of the

---

[132] *Id.* at *6–7.

[133] *Id.* at *5.

duty of loyalty."[134]  The court then took this logic a step further, stating that it would result in "strict fiduciary liability for workplace misconduct."[135]  The court reasoned that this would constitute an "expansion" of Delaware law.[136]

As discussed above, *McDonald's* was a fact-specific application of long-settled principles of Delaware law—that a fiduciary acts in bad faith when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation."[137]

The duty of loyalty has been defined "capaciously" to bind fiduciaries, whatever the context.[138]  As retired Chief Justice Strine and his co-authors have explained: "Because every act of a director must be done for a proper, loyal purpose, every act in every context implicates the duty of loyalty."[139]

---

[134] *Id.* at *5.

[135] *Id.*

[136] *Id.*

[137] *Stone*, 911 A.2d at 369 (quoting *Disney*, 906 A.2d at 67).

[138] Leo E. Strine, Jr., Lawrence Hamermesh, R. Franklin Balotti, & Jeffrey Gorris, *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 633–34 (2010) ["*Loyalty's Core Demand*"] ("Because the discretion that the DGCL affords directors is so wide, it is vitally important that directors exercise this discretion to advance the corporation's best interests and not for improper purposes . . . . [I]t has been traditional for the duty of loyalty to be articulated capaciously, in a manner that emphasizes not only the obligation of a loyal fiduciary to refrain from advantaging herself at the expense of the corporation but, just as importantly, to act affirmatively to further the corporation's best interests.  In this respect, our law has been clear that the duty of loyalty is implicated by all director actions because all such actions must be undertaken in good faith to advance the corporation's best interests and because directors owe an affirmative obligation to put in a good faith effort to responsibly carry out their duties.").

[139] *Id.* at 639.

A claim for breach of the duty of loyalty examines *whether* the fiduciary acts with the intent of advancing the best interests of the corporation, not *why* the fiduciary fails to do so.  As this court stated in *ODN Holding*, "[i]t makes no difference the reason *why* the [fiduciary] intentionally fails to pursue the best interests of the corporation."[140]  In *Guttman*, this court explained that "[t]he reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless."[141]  And Chancellor Allen said it best in *RJR Nabisco*:

> Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame or pride.  Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation.  But if he were to be shown to have done so, how can the protection of the business judgment rule be available to him?  In such a case, is it not apparent that such a director would be required to demonstrate that the corporation had not been injured and to remedy any injury that appears to have been occasioned by such transaction?[142]

Delaware courts have applied these basic principles across myriad factual contexts, finding that a fiduciary acts disloyally when: using company resources for

---

[140] *ODN Hldg. Corp.*, 2017 WL 1437308, at *27 (cleaned up).

[141] *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

[142] *RJR Nabisco*, 1989 WL 7036, at *15.

personal reasons;[143] embezzling company funds;[144] engaging in unauthorized related-party transactions;[145] using material and non-public company information to trade;[146] using confidential company information to compete with the company;[147] and usurping corporate opportunities.[148]

---

[143] *See, e.g., Sutherland v. Sutherland*, 2010 WL 1838968, at *4–7 (Del. Ch. May 3, 2010) (denying summary judgment against a claim that a defendant breached fiduciary duties by causing the company provide audit services for his personal use).

[144] *See, e.g., QC Commc'ns Inc. v. Quartarone*, 2014 WL 3974525, *11–13 (Del. Ch. Aug. 15, 2014) (finding post-trial that the defendant breached his duty of loyalty by retaining company sale proceeds for his personal benefit); *Smith v. Smitty McGee's, Inc.*, 1998 WL 246681, at *2–3 (Del. Ch. May 8, 1998) (finding the plaintiffs stated a claim that a defendant misappropriated company funds for loan payments on his family's personal properties and personal legal costs).

[145] *See, e.g., In re InfoUSA, Inc. S'holder Litig.*, 953 A.2d 963, 999–1000 (Del. Ch. 2007) (finding that the complaint stated a claim for breach of fiduciary duty where the company made payments to the defendants' personal corporation covering the use of private jets, a private yacht, a personal residence in California, and travel expenses); *MGG SPV Duck LP ex rel. Shari's Rest. Gp., Inc. v. Borgese*, 2025 WL 3232791, at *9–10 (Del. Ch. Nov. 19, 2025) (finding the plaintiff stated a claim where company directors approved an intercompany loan to a related business without expectation of repayment).

[146] *See, e.g., Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949); *In re Fitbit, Inc. S'holder Deriv. Litig.*, 2018 WL 6587159 (Del. Ch. Dec. 14, 2018) (finding that the complaint stated a claim for breach of fiduciary duty where the defendant allegedly traded with knowledge of the company's disappointing product development).

[147] *See, e.g., Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601–03 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (finding post-trial that an officer-defendant breached the duty of loyalty when he revealed confidential business information to competing companies); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 854–56 (Del. Ch.), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron* (Del. Ch. 2022) (finding post-trial that the defendant breached his duty of loyalty by sharing confidential company information with a competing company for which he was a consultant).

[148] *See, e.g., Kates*, 8 A.3d 573, 585–87, 603 (finding post-trial that an officer-defendant breached the duty of loyalty when he sought to poach his former company's clients and employees).

The duty of loyalty extends to the misuse of *human* resources, as multiple cases of this court have recognized.[149] In *Sorrento Therapeutics*, the court found post-trial that the defendant acted disloyally by treating administrative employees and consultants "as resources for himself personally rather than company resources."[150] Similarly, in *Guth*, the Delaware Supreme Court affirmed this court's post-trial decision that a former officer breached his fiduciary duties by using the company's money, credit, facilities—as well as personnel—in the furtherance of a competitive venture.[151]

These decisions reflect that human resources are company resources. To many companies, employees are the most important resource. Harming or misusing corporate resources for selfish purposes can constitute a breach of the duty of loyalty. So too can misusing human resources for selfish purposes.

---

[149] *See, e.g.*, *Guth*, 5 A.2d at 510. (holding that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests" and must "refrain from doing anything that would work injury to the corporation").

[150] *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *28 (Del. Ch. Sept. 1, 2023).

[151] *Guth*, 5 A.2d at 510; *see also Klein v. Wasserman*, 2019 WL 2296027, at *7 (Del. Ch. May 29, 2019) (sustaining a claim for breach of fiduciary duties where the defendant "disregarded [company] protocol by making direct demands on employees, requesting immediate responses, and threatening some employees with adverse employment actions" and noting that at the pleading stage, allegations that the company suffered "internal disruption and corporate instability" as a result of the defendant's behavior was sufficient); *CertiSign Hldg., Inc. v. Kulikovsky*, 2018 WL 2938311, at *17 (Del. Ch. June 7, 2018) (finding post-trial that a former director was liable for breach of the duty of loyalty where the director manipulated corporate employees to advance his personal interests through "petty tactics that jeopardized the well-being of CertiSign and its stockholders"); *BelCom, Inc. v. Robb*, 1998 WL 229527, at *4 (Del. Ch. Apr. 28, 1998), *aff'd*, 725 A.2d 443 (Del. 1999).

44

*McDonald's* demonstrates that just as a fiduciary acts disloyally when misusing fungible or intangible corporate resources, a fiduciary acts disloyally when "us[ing] a position of power to harass, intimidate, or assault employees."[152] In this way, *McDonald's* recognizes what is obvious—fiduciaries who sexually harass employees and agents do not do so for the purpose of advancing the company's interests. And all that can be said of sexual harassment applies with greater force to drugging, raping, and sexually assaulting employees. Did *McDonald's* establish a *per se* breach? No, it did not create a categorical rule for sexual harassment. *McDonald's* applied established principles to a slightly different fact pattern than the cases that came before. It did not expand of Delaware law.

By excluding workplace misconduct that is of a sexual nature from the category of employee-targeting, entity-harming activities that can give rise to a claim for breach of fiduciary duty, *Credit Glory* did what many have cautioned against: exclude a particular category of motivation and a particular category of harm from the ambit of the duty of loyalty. In this way, *Credit Glory* moved Delaware law, not *McDonald's*.

### ii.    The Sprawl Argument

*Credit Glory* raised a related concern about *McDonald's*—that it "lacks a limiting principle" that could lead to "doctrinal sprawl" and contort corporate law into some sort of "general morality code" and sexual harassment into a form of "strict

---

[152] *McDonald's*, 289 A.3d at 380 (citing Hemel & Lund, *supra*, at 1641–42 & n.414 (citing *Prozinski v. Ne. Real Estate Serve.*, 797 N.E.2d 415, 423–24 (Mass. App. Ct. 2003) (holding that when an officer "allegedly embarked on a course of sexual harassment of [a] receptionist," his "placement of his own interests above those of the company he served could be found by a fact finder to constitute an act of disloyalty")).

45

fiduciary liability."[153]    In the words of *Credit Glory*, "[i]f every self-serving, reprehensible act by an officer constitutes fiduciary disloyalty, then a breakroom fistfight, a defamatory social medial post, or theft of office supplies becomes an internal affairs matter."[154]

It is true that Delaware law articulates the duty of loyalty "capaciously."[155] This is not new.  As discussed above, for a fiduciary, "every act in every context implicates the duty of loyalty."[156]  But this longstanding, broad articulation does not invariably lead to liability, much less threaten strict liability, nor otherwise signal doctrinal sprawl.

The procedural vehicle through which stockholders pursue fiduciary claims arising from corporate harm provides a powerful protection against liability.  A claim for corporate harm is a derivative claim.  The bedrock principle of Delaware corporate law is that "directors, rather than shareholders, manage the business and affairs of the corporation."[157]  Litigation assets are like any other assets; the board of directors controls them.[158]  But some litigation seeks redress for "harm inflicted upon the

---

[153] *Id.* at *4–5.

[154] *Id.* at *5.  *See* Defs.' Supp. Br. at 2 (relying on "general morality code" arguments).

[155] *Loyalty's Core Demand*, *supra*, at 634.

[156] *Id.* at 639.

[157] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[158] *Agostino v. Hicks*, 845 A.2d 1110, 1115–16 (Del. Ch. Mar. 2004) (explaining that "[o]ne corporate power exercised by the board of directors is the conduct of litigation that seeks to redress harm inflicted upon the corporation").

corporation by its officers or directors."[159]   Because "directors and officers of a corporation may not hold themselves accountable to the corporation for their own wrongdoing, courts of equity have created an ingenious device to police the activities of corporate fiduciaries: the shareholder's derivative suit."[160]

The derivative suit grants stockholders standing to hold fiduciaries accountable for fiduciary misconduct that harms the corporation.   In this way, a derivative suit acts as a form of indemnification.[161]   Just as "indemnification shifts the burden of loss from the party that suffered it to the party that should bear it,"[162] derivative suits shift the burden of loss from the corporation to the disloyal fiduciary.

Holding fiduciaries accountable for misconduct that harms the corporation can give rise to collateral benefits external to the corporation.   For example, requiring that fiduciaries create a system to monitor legal compliance encourages legal compliance.   That, in turn, benefits the communities that the laws governing the corporation were intended to protect.   To the extent that the system generates these

---

[159] *Id.* at 1116.

[160] *Id.*; *see also Schoon v. Smith*, 953 A.2d 196, 201 (Del. 2008) ("To prevent 'a failure of justice,' courts of equity granted equitable standing to stockholders to sue on behalf of the corporation 'for managerial abuse in economic units which by their nature deprived some participants of an effective voice in their administration.' The courts reasoned that without equitable standing, 'stockholders would be without any immediate and certain remedy,' there would have been a complete failure of justice, and the general principles of equity and fairness would have been defeated. Today, the result of this judicially-created doctrine is known as the stockholder derivative action.").

[161] *See Firefighters' Pension Sys. of City of Kansas City v. Foundation Building Mat'ls, Inc.*, 318 A.3d 1105, 1182 (Del. Ch. May 31, 2024).

[162] *Id.*

knock-on effects, it is a positive thing.[163]  But minimizing negative externalities is *not* the purpose of a derivative suit; nor is the equitable vehicle of derivative claims intended to police some "general morality code."[164]  Derivative suits serve a very limited purpose—they provide stockholders standing to pursue claims that shift losses from the company that was harmed to the fiduciary that harmed it.

There is no shortage of limiting principles protecting fiduciaries from derivative suits or discouraging stockholders from pursuing them.  Procedural hurdles unique to the derivative suit include: the demand requirement;[165] the contemporaneous ownership requirement;[166] the continuous ownership requirement;[167] adequacy standards;[168] the threat of being "*Walmart*-ed";[169] and the risk of being derailed by a special litigation committee.[170]  All have the potential to terminate a case, most at the outset of the litigation.

---

[163] *See* Leo E. Strine, Jr., Kirby M. Smith, & Reilly S. Steel, *Caremark and ESG, Perfect Together: A Practical Approach to Implementing and Integrated, Efficient, and Effective Caremark and EESG Strategy,* 106 Iowa L. Rev. 1885 (recognizing that "scholars have viewed [*Caremark*] as having enormous value in encouraging more intensive diligence in the area of compliance," *id.* at 1897, and arguing that "corporate risk aversion and law compliance efforts under *Caremark*" overlaps and positively reinforces corporate focus on [employee environmental, social, and governance] issues, *id.* at 1907).

[164] *Credit Glory*, 2025 WL 3439671, at *5.

[165] Ct. Ch. R. 23.1.

[166] 8 *Del. C.* § 327.

[167] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984).

[168] Ct. Ch. R. 23.1(c).

[169] *See Cal. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 832–33 (Del. 2018).

[170] *See Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

The collective action problem in Delaware's private enforcement system serves as a further limiting principle. Stockholders rationally lack incentives to foot the full bill for litigation when they only benefit *pro rata* from the recovery to the company.[171] For this reason, Delaware law allows attorneys to pursue derivative claims on a contingent basis. A contingent-fee attorney is only rewarded for successful results and, typically, paid fees proportionate to the degree of success.[172] Attorney's fees are subject to judicial review. The court thus sets the market for derivative suits, awarding fees based on the value of the benefit to the company. If an attorney cannot achieve her hourly rate on a risk-adjusted basis, then there is no market for pursuing the claim.[173]

Because contingent-fee attorneys are paid proportionate to the benefits they confer on the corporation, a contingent-fee attorney has no incentive to pursue claims challenging infractions that resulted in minor harm. Take a one-off fistfight in the breakroom. Setting aside the question of whether the fight constitutes a breach of the duty of loyalty, a plaintiff's attorney has no incentive to pursue a claim where the recovery would be minimal. But "Fight Club" in the breakroom? That might pique a

---

[171] *See Bird v. Lida*, 681 A.2d 399, 402 (Del. Ch. 1996) (observing that "individual shareholders have little incentive to bear the costs associated with activities the monitor board of director (or management) performance").

[172] *See generally In re Dell Techs. Inc. Class V S'holder Litig.*, 326 A.3d 686, 699 (Del. 2024).

[173] *See, e.g.*, *Anderson v. Magellan Health, Inc.*, 298 A.3d 734, 755 (Del. Ch. 2023) (granting attorney's fees at a steep discount to movant's lodestar to "send a signal that these sorts of cases are not worth the attorneys' time," and noting that "[w]here lawsuits are not worth much, plaintiffs' counsel should not be paid much").

contingent-fee attorney's interest, if the harm to the company was significant enough to support a fee award worth her time spent remedying it. The same is true of defamatory social media posts that truly harm the corporation,[174] or a major theft of office supplies. If the harm is significant enough, then there might be a market for the claim. (For that matter, if the harm is significant enough, the board might cause the company to pursue the claim directly.)

In all events, persons concerned about a lack of limiting principles post-*McDonald's* need look no further than *McDonald's*. The staged way in which the court decided the motions obscured what should have been the lede: "*McDonald's* Case Dismissed." As discussed above, the court concluded that the majority of the board was capable of impartially considering a demand to pursue the claims against Fairhurst and others. Much of that reasoning turned on the board's response to Fairhurst's actions, which was exemplary, and which undermined any inference of bad faith or partiality on the part of the board. And to emphasize the point, the court dismissed the *entire* case under Court of Chancery Rule 23.1—the claims against the board as well as the claim against the chief people harasser. Far from strict liability, *McDonald's* involved zero liability.

*McDonald's* illustrates the difficulty of pursuing derivative suits and the extreme limiting principles that minimize the threat of liability arising from them. It does not threaten doctrinal sprawl.

---

[174] *See, e.g.*, *Schnatter v. Shapiro et al.*, C.A. No. 2018-0646-AGB (Del. Ch.), Dkt. 1 ¶ 45 (asserting claims for breach of fiduciary duty against a director who launched a "false and defamatory campaign" against the company's founder).

### iii.     The Preemption Argument

*Credit Glory* identified numerous concerns described as "preemption."[175]  That reasoning draws on preemption doctrine by means of analogy, because no federal or state employment law preempts a stockholder from bringing derivative claims for breach of fiduciary duty based on workplace misconduct.  This category of concerns broadly conveyed two sentiments.  First, the decision described the derivative suit as an unnecessary form of "second" remedy duplicative of the first remedy sought by the survivor of the sexual misconduct.[176]  Second, the decision stated that permitting derivative claims based on violations of employment law would "authorize an end-run around" a series of employment statutes, "allowing stockholder plaintiffs to bypass requirements that bind actual victims."[177]

Viewing a derivative suit as a duplicative form of "second" recovery ignores its indemnification-like purpose and conflates harm to the survivor with harm to the corporation.  Vice Chancellor Zurn captured the distinction between types of harm in *Boeing*:

> The primary victims of the crashes are, of course, the deceased, their families, and their loved ones. While it may seem callous in the face of their losses, corporate law recognizes another set of victims: Boeing as an enterprise, and its stockholders. The crashes caused the Company and its investors to lose billions of dollars in value. Stockholders have come to this Court claiming Boeing's directors and officers failed them in overseeing mission-

---

[175] *Credit Glory*, 2025 WL 3439671, at *5–6.

[176] *Id.* at *1.

[177] *Id.* at *6.  *See* Defs.' Supp. Br. at 3–4 (relying on preemption argument).

> critical airplane safety to protect enterprise and stockholder value.[178]

The same is true here. What *Credit Glory* calls the "second" remedy is the first and only remedy for the corporation. Preemption does not foreclose that remedy.

Nor is the existence of employment laws a basis to preempt derivative actions. The Federal Aviation Administration regulates airplane safety, yet the existence of those regulations did not preempt the derivative action in *Boeing*.[179] The U.S. Food and Drug Administration regulates ice cream, yet the existence of those regulations did not preempt the derivative action in *Marchand*.[180] Anti-money laundering and know-your-customer laws regulate banks, yet the existence of those regulations did not preempt the derivative action in *Stone*.[181] To the contrary, it was the existence of those laws and regulations, and the injury resulting from fiduciary-caused violations, that the derivative claims sought to remedy. So too with employment law.

The second issue—the end-run issue—is a real concern, but it is a practical problem for which this court has solutions. Often, a prior or parallel lawsuit forms the basis for a derivative claim—a securities action, a criminal investigation, or a state regulatory proceeding, for example. Here, it is the survivors' anti-trafficking suits. To avoid end-running the discovery and procedural rules governing the

---

[178] *In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *1 (Del. Ch. Sept. 7, 2021).

[179] *Boeing*, 2021 WL 4059934, at *25–26.

[180] 212 A.3d 805 (Del. 2019).

[181] 911 A.2d 362 (Del. 2006).

underlying action, this court has the discretion to stay the derivative action pending resolution of "related actions involving the same events or conduct."[182]

The fact of parallel litigation does not preempt a stockholder's ability to bring a derivative suit. It is often the reason for bringing the derivative suit, and this court has tools for managing litigation in a way that avoids undermining the integrity of the underlying proceeding.

### iv. The Comity Argument

*Credit Glory* also cited "comity" as a basis for dismissal.[183] The court wrote that "the internal affairs doctrine *and comity principles underlying it* foreclose Brola's attempt to recast employment disputes as breaches of fiduciary duty. Under that doctrine, Delaware law governs the relationships between corporate owners and

---

[182] *See, e.g.*, *In re Duke Energy Corp. Coal Ash Deriv. Litig.*, 2015 WL 5135066 (Del. Ch. Aug. 31, 2015) (staying derivative suit pending resolution of several regulatory enforcement actions); *see also South v. Baker,* 62 A.3d 1 (Del. 2012); *Brenner v. Albrecht*, 2012 WL 252286, at *7 (Del. Ch. Jan. 27, 2012) (staying derivative proceedings pending outcome of securities class action); *Brudno v. Wise*, 2003 WL 1874750, at *5 (Del. Ch. Apr. 1, 2003) (staying derivative proceeding "[g]iven that the overwhelming thrust of the Delaware Action complaint is a demand for indemnification largely for harm to be incurred by [the corporation] in the Federal Securities Action, the sensible ordering of events is for the Federal Securities Action to proceed first"); *In re Massey Energy Co.*, 2011 WL 2176479, at *27 (Del. Ch. May 31, 2011) ("[T]he plaintiffs, as fiduciaries for other Massey stockholders, [should] be reluctant to prosecute the Derivative Claims they claim are so valuable until the direct claims against Massey are resolved. . . . Thus, the Derivative Claims should follow, rather than precede, the resolution of the key direct suits and regulatory proceedings."). This approach also tracks with viewing a derivative suit as a form of indemnification–a claim that ripens when the "a loss triggering the indemnification obligation has been established." *Foundation Building Mat'ls.*, 318 A.3d at 1183.

[183] *Credit Glory*, 2025 WL 3439671, at *6.

managers. It does not reach interpersonal matters occurring within other states' borders."[184]

Recast as a comity issue, this line of reasoning seems to rest on the same premises that infect the others. It too conflates law governing the treatment of employees with the indemnification function of derivative suits. It too categorically excludes employment matters from the scope of conduct that can give rise to fiduciary harm. It too ignores practical ways in courts routinely avoid infringing on rules and procedures governing the underlying litigation. Indemnification-oriented derivative actions do not implicate comity concerns.

### v. The Powers Argument

*Credit Glory* posits that actions taken for "personal gratification" are not corporate acts because they do not involve the use of fiduciary powers.[185] The decision distinguished *McDonald's* on the ground that "the defendant was a senior officer charged with maintaining a safe and respectful workplace at the enterprise level."[186] The court reasoned that if "any midlevel manager could commit the same wrongs," then the wrong cannot give rise to a breach of fiduciary duty.[187]

To the extent this action implicates the powers argument, it too injects new considerations into fiduciary law.[188] Consider embezzlement cases, *Brophy* claims,

---

[184] *Id.* (emphasis added).

[185] *Id.* at *5 & n.46.

[186] *Id.* at *5.

[187] *Id.*

[188] Plaintiff argues that this action does not appear to implicate the powers argument because Plaintiff alleges that Sanford was able to cover up the misconduct and

54

related-party transaction challenges, or any of the cases involve the misuse of a corporate jet or yacht.[189] None of them ask whether the fiduciary had oversight responsibilities covering the precise wrong, or whether midlevel managers had access to the same funds, information, negotiation opportunities, or other resources. They all focus on whether the fiduciary-defendant acted contrary to the best interests of the corporation.

The usurpation cases provide perhaps the starkest example. In *Guth*,[190] the Delaware Supreme Court affirmed this court's post-trial decision finding that a former officer breached the duty of loyalty by usurping a corporate opportunity. In his defense, the officer argued that the opportunity came to him in a purely personal capacity, and that a fiduciary has no obligation to refrain from pursuing opportunities presented to him in a personal capacity.[191]

The high court rejected this argument, reasoning that "[t]he real issue is whether the opportunity . . . was so closely associated with the existing business activities of Loft, and so essential thereto, as to bring the transaction within that class of cases where the acquisition of the property would throw the corporate officer

---

retaliate against the whistleblower by virtue of his fiduciary powers. *See generally* Pl.'s Supp. Br. at 5–6.

[189] *See, e.g., Sutherland*, 2010 WL 1838968, at *4–7; *QC Commc'ns Inc.*, 2014 WL 3974525, at *11–13; *InfoUSA, Inc.*, 953 A.2d 963, 999–1000; *Fitbit*, 2018 WL 6587159; *Smitty McGee's, Inc.*, 1998 WL 246681, *at 2–3; *Sorrento Therapeutics*, 2023 WL 5670689, at *28.

[190] 5 A.2d 503, 510 (Del. 1939).

[191] *Id.* at 512 ("It is urged by the appellants that Megargel offered the Posi-Cola opportunity to Guth personally, and not to him as president of Loft.").

purchasing it into competition with his company."[192]    Put differently, the question was not whether the officer was presented with the opportunity in a personal capacity, or even whether the officer could pursue it independent of the company. Rather, the question was whether the opportunity placed the fiduciary in conflict with the corporation.  The court held corporate officers and directors must "refrain from doing anything that would work injury to the corporation," no matter how that opportunity came to the fiduciary.[193]

This decision does not draw on *Guth* directly.  Neither *Credit Gory* nor this action involve claims of usurpation.  But there are lessons from usurpation cases.  If fiduciary principles do not permit a corporate officer to seize a corporate opportunity for himself even if it came to him in a personal capacity, why would fiduciary principles allow a corporate officer to abuse an employee of the company so long as he did not use powers uniquely derived from his fiduciary position?  The law does not look to the powers used when harming the corporation.  The law looks at whether the person was a fiduciary and his motives when doing so.  The capacity argument is another new move advanced for the first time in *Credit Glory*.

### vi.        The Policy Argument

Last, the *Credit Glory* court advanced the following policy argument:

> [T]reating sexual harassment-based claims as corporate assets creates perverse incentives. It risks commodifying personal trauma, forcing it into public derivative litigation that lacks the privacy protections of employment statutes.

---

[192] *Id.* at 513.

[193] *Id.* at 510.

> Equity must not sanction collateral litigation that exposes victims to unwanted scrutiny in the service of a corporate recovery and attorneys' fees.[194]

This statement reflects the commendable desire to protect survivors of sexual assault.[195]

Translating that desire into corporate-law policy for limiting derivative suits, however, is irregular. Personal traumas often undergird corporate traumas that derivative suits seek to remedy, as derivative suits involving human fatalities show. Yet this court has never expressly considered the effects of the derivative suit on traumatized non-parties when resolving a motion to dismiss.[196]

Moreover, reasonable minds can differ about how to best protect survivors. It is true that there is something about sex-based issues that make people want to treat them differently.[197] Embezzlement can give rise to both employment law and

---

[194] *Credit Glory*, 2025 WL 3439671, at *7.

[195] *See* Defs.' Supp. Br. at 3–4 (relying on the *Credit Glory* policy argument); Pl.'s Supp. Br. at 9–10 (denying the existence of perverse incentives in this case, noting that "[t]he witnesses . . . relied on in the Complaint were the Whistleblower (who is a former Board member) and two former employees with personal knowledge . . ." and "[t]o the extent any aspect of this case relies upon victims' accounts of sexual misconduct, the survivors have already come forward in federal court proceedings[.]").

[196] *See, e.g., Marchand*, 212 A.3d 805; *Boeing*, 2021 WL 4059934; *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016). One set of scholars has argued that this court *should* consider the effects of corporate action on human life when analyzing derivative suits. But they do not argue for dismissing those suits. Rather, they argue that derivative suits gain greater significance the greater the threat to human life. *See* Robert E. Bishop & Frank Partnoy, *Corporate Oversight & Risk to Human Life* (2026) (unpublished manuscript).

[197] *See* Aya Gruber, *Sex Exceptionalism in Criminal Law*, 75 Stan. L. Rev. 755, 821– 24 (2023) (discussing the sex-blinders phenomenon and observing that "[s]ex has the

57

fiduciary issues, yet no one recoils at that combination. Workplace sexual misconduct often inspires a different reaction. Should it? Is sex-based harm categorically different from other causes of corporate harm? Should Delaware provide a fiduciary cause of action for taking money (embezzlement) or tangible property (theft) but not for an encroachment tied to a person's sex? On what basis would Delaware law exclude this conduct as a source of derivative claims?

*Credit Glory* identified one basis grounded in a concept discussed in feminist theory—commodification. Other concepts discussed in feminist theory might direct a different outcome. Some might argue that agency and voice weigh in favor of allowing survivors to self-determine whether claims for breach of fiduciary duties that promote good corporate governance are best for them. Others might cite problems with sex exceptionalism as a knock against the categorical exclusion of sex-based misconduct from fiduciary claims.

There are undoubtedly many unexplored applications of feminist theory to corporate law. And this is the sort of interesting issue that academics can and should debate. But judges should resist the urge. This court's subject-matter expertise has its limits. And even one who agrees with the outcome of *Credit Glory* must agree that members of this court should not be balancing competing feminist theories when resolving motions to dismiss derivative actions.

---

amazing ability to induce an acute form of analytic myopia in even the most thoughtful of analysts").

In the end, the Court of Chancery Rules offer many privacy-related procedural protections for non-parties,[198] and those protections have been effectively deployed to protect a variety of sensitive information and minimize burdens on non-parties, including survivors. This court need not eliminate an entire cause of action to accomplish what can be achieved through procedural safeguards.

### vii. Conclusion Regarding *Credit Glory*

Effectively, *Credit Glory* argues for changing Delaware law to exclude a single type of workplace misconduct from the activities that can give rise to fiduciary breach. No Delaware case has ever done this. No identified Delaware policy supports it. No doctrine of preemption or comity demands it. And that outcome conflicts with at least one well-reasoned decision of this court. The court thus declines Defendants' request to follow *Credit Glory*. If *Credit Glory* reflects a split in Delaware law, that does not render Delaware law unpredictable. Reasonable trial judges can differ in their conclusions. Resolving those differences is a function of the appellate process.[199]

---

[198] *See, e.g.*, Ct. Ch. Rule 5.1 (governing confidential filings); Ct. Ch. R. 45(c)(1) (establishing protections for persons subject to subpoenas).

[199] In support of their motion to dismiss the claims of retaliation, Defendants rely on footnote 41 in *Credit Glory*. Defs.' Supp. Br. at 5 (citing *Credit Glory*, 2025 WL 3439671, at *5 n.41). Footnote 41 states that no Delaware decision created "a rule that a viable breach of fiduciary duty claim arises whenever an officer engages in unlawful harassment." *Credit Glory*, 2025 WL 3439671, at *4 n.41. For that proposition, *Credit Glory* cites to *Personal Touch Holdings Corp. v. Glaubach*, 2019 WL 937180, at *25 (Del. Ch. Feb. 25, 2019). *Personal Touch* did not involve a claim that sexual harassment constituted a breach of fiduciary duty. It cited a New York case that addressed the issue, which it did not comment on or endorse, and which did not apply Delaware law. *See id.* at *25 n.299 (citing *Pozner v. Fox Broad. Co.*, 74 N.Y.S.3d 711, 713–14 (N.Y. Sup. Ct. 2018)); *see also McDonald's*, 289 A.3d at 381 n.25 (discussing and distinguishing *Pozner*).

59

### c. Conclusion Regarding The Active-Misconduct Claim

Plaintiff alleges that, for self-interested reasons, Sanford covered up reports of drugging and sexual assault by withholding assault-related information from other Board members and by ousting the Whistleblower.

As for Sanford's role in the cover-up, the Complaint alleges that Sanford knew of the illegal conduct and struck a deal to retain Golden so that Gove, a top Influencer in Sanford's downline,[200] would remain with the Company.[201] Sanford allowed Golden to stay at the Company until February 2023, when his share incentive package vested. Sanford approved Bjorkman's "Accelerated Compensation

---

More relevant here, *Credit Glory* describes *Personal Touch* as "*holding* that a director's 'troubling' and 'improper[r]' *retaliation* against employees who complained of harassment did not breach the duty of loyalty because the conduct, though directed at the employees, was not motivated by an intent to harm the corporation or obtain a personal financial benefit." *Id.* (emphases added). That was not the holding of *Personal Touch.* The claim for breach of fiduciary duties in *Personal Touch* challenged two distinct categories of conduct: (i) the defendant's alleged retaliation against employees who complained about sexual harassment; and (ii) the director's alleged "inflammatory" interactions with other board members. *Id.* at *23 (emphasis added). The court held that the plaintiff failed to prove the first theory—that of retaliation—because the defendant "never threatened to fire [the employee] or to harm her in any way after" she reported him for sexual harassment. *Id.* at *24. The court commented that the defendant acted "improperly" to make the employee "feel uncomfortable," and that aspects of his behavior were "troubling," but concluded that "[t]he record evidence of retaliation [was] limited." *Id.* at *24–25. The court also rejected the second theory. The court found that the whole of the defendant's conduct "although uncivil, was motivated by a genuinely held belief on his part that Personal Touch was being mismanaged and a sense of frustration that his fellow directors were ignoring concerns he had been expressing to them for many months about the Company's management." *Id.* at *24. Thus, *Personal Touch* does not support excluding retaliation for reports of sexual harassment as a basis for fiduciary breach.

[200] Compl. ¶¶ 86–87, 150.

[201] *Id.* ¶ 87.

Agreement" and Conord's compensation package with knowledge of their sexual misconduct and the reasons for their termination.[202]   And Sanford declined to nominate the Whistleblower for reelection, although he had previously planned to do so, after the Whistleblower came forward to report the sexual misconduct.

This is all reasonably conceivable.  It is reasonably conceivable that Sanford actively covered up acts of rape and sexual assault, refused to report that information to the Board, and retaliated against the person who did.  It is therefore reasonably conceivable that Sanford breached his duty of loyalty to the company.

Count II states a claim.

### 2.    Claim That Defendants Breached Their Oversight Obligations

There are "two possible paths for a plaintiff to plead a claim for breach of the duty of oversight":  "by alleging that the board lacked the requisite information system and controls," an "information-systems claim;" and "by alleging that the board's information system generated red flags indicating wrongdoing to which the directors failed to respond," a "red-flags claim."[203]  Plaintiff advances both theories. Because Plaintiff has adequately alleged a "Red-Flags Claim," Count II states a claim, and this analysis does not reach Plaintiff's information-systems claims.

A red flag for *Caremark* purposes informs the fiduciary of a central compliance risk.[204]  A red flag can arise from internal or external sources.  Either way, corporate

---

[202] *Id.* ¶ 151.

[203] *McDonald's*, 291 A.3d at 676.

[204] *Marchand*, 212 A.3d at 824; *McDonald's*, 289 A.3d at 376.

fiduciaries "ha[ve] an obligation to respond."[205]  "[C]orporate fiduciaries who are aware of harassment but fail to react . . . may be sued for breach of the duties of care and loyalty."[206]

Plaintiff alleges, and Defendants concede, that the Board was aware of the sexual misconduct at least as late as April 2022, when Agent Five emailed the Board to request a change of sponsorship and the Whistleblower proposed concrete steps for addressing the misconduct.  And Plaintiff alleges, and Defendants do not dispute that the misconduct at issue—the harassment, drugging, assault, and rape of real estate agents in a real estate company—posed central compliance risk.[207]  Instead, Defendants argue that the Board was unaware of the issues prior to receiving the email, that the email did not alert the Board to the full scope of the misconduct, and that the Board took action in response and did so in good faith.

The parties' competing positions raise three issues: First, did the Board receive any red flags of the harassment, drugging, assaults, and rapes before April 2022? Second, was the April 2022 communication a red flag?  Third, did the Board respond in good faith before the first anti-trafficking suit?

---

[205] *McDonald's*, 291 A.3d at 680.

[206] *Id.* at 676; *see also AmerisourceBergen Corp.*, 2020 WL 132752, at *20 ("A claim that directors had notice of serious misconduct and simply brushed it off or otherwise failed to investigate states a claim for breach of duty.").

[207] Nor do Defendants dispute that harassing, drugging, assaulting, and raping real estate agents raised "mission critical" risk for a real estate company.  *See Marchand*, 212 A.3d at 824 (using "mission critical" language).

First, it is reasonably conceivable that the Board received red flags before April 2022.

In September 2020, an eXp agent posted on Facebook that she had been drugged at an eXp recruiting event. The post went viral. Hundreds of people commented on the post, including seven other women who stated that they too had been drugged and sexually assaulted at eXp events. Defendants argue that it is unreasonable to infer that any director learned about this post or its contents. The Company is large, they say. A director cannot keep track of each agent's social media account, they argue. Those positions resonate and are sensible. But this social media post was not some everyday status update, GIF, or meme. This post accused a top eXp Influencer of drugging and raping an eXp recruit at an eXp event. And in response to the post, many other women stated that they had the same experience. Shortly after the post, top-agent Bjorkman was arrested and eXp terminated his contract. It is hard to believe that no one thought to tell any of the eXp Board members about the accusations in the post, Bjorkman's arrest, or the reasons for Bjorkman's termination. But it is true, as Defendants note, that no Board nor Board committee meeting minutes reflect discussion of the September 2020 incidents.

In October 2020, an eXp agent sent an eleven-page memorandum describing Golden's and Bjorkman's pattern of drugging, raping, and sexually harassing agents. They were also blackmailing the victims, she explained. The memo detailed at least seven incidents of this behavior and identified Bjorkman and other agents who sexually harassed her personally. The agent sent the memo to three executives,

including then-CEO Gesing, who was also on the Board. Although the CEO received and extremely detailed memo of extraordinarily illegal and immoral behavior implicating multiple eXp Influencers, Defendants insist that it is not reasonable to infer that he reported that information to the Board. And it is true, as Defendants note, that there are no Board or Board committee meeting minutes reflecting discussion of this incident.

In these circumstances, the lack of any mention of the sexual misconduct issues in Board or committee minutes does not obviate the inference that the board was made aware of the issues. This is true particularly given that the Complaint alleges that the Whistleblower raised the issues with the Board in early 2021. Defendants contend that all the allegations attributed to the Whistleblower should be disregarded because they are not adequately particularized. For Rule 12(b)(6) purposes, a plaintiff need not plead particularized allegations. Particularity matters only as to the demand futility analysis, as discussed below. But these are particularized in any event, as also discussed below.[208]

Second, it is reasonably conceivable that the April 2022 communication was a red flag.

Defendants argue that Agent Five's April 20, 2022 email to the full Board was not a "red flag" because it contained only "conclusory rhetoric."[209] But the email

---

[208] *See* Legal Analysis § II.B, *infra*.

[209] eXp Opening Br. at 38 (citing *Rojas v. Ellison*, 2019 WL 3408812, at *11 (Del. Ch. July 29, 2019)).

states that "Rophynol[,] the rape drug" is "part of the eXp corporate culture" and references "sexual harassment" and "drugging" of eXp agents.[210] She names four other agents to whom she escalated the sexual assault issues to and who did nothing, some of whom were named in the October 2020 memorandum as having participated in sexual harassment and assaults.[211] And she refers to multiple women who had similar experiences at specific, identified, events.[212] This is not conclusory rhetoric. It is the sort of communication that a board should take seriously. Even if the board viewed the email as conclusory, it might consider asking for more detail.

Defendants' contention that the email describes no "ongoing" incident is similarly specious.[213] The email urges the Board to take action to "make a difference" regarding the present problems of sexual harassment and a "rape drug" "corporate culture."[214] The communication identified alleged perpetrators who, at the time, were still agents with the Company. And the communication highlighted Agent Five's inability to report upward without being silenced or retaliated against. The email constituted a red flag of an ongoing issue.

Third, it is reasonably conceivable that the Board failed to respond to red flags.

Defendants point to three responses by the Board to argue that it is unreasonable to infer that the Board failed to respond: the Board terminated

---

[210] Agent Five Email Commc'ns at eXp_0820C.

[211] *Id.*; *compare id., with* Anonymous Memorandum at 1.

[212] Agent Five Email Commc'ns at eXp_0826C.

[213] eXp Opening Br. at 38.

[214] Agent Five Email Commc'ns at eXp_0820C.

Bjorkman's employment in September 2020; launched an internal investigation at some point after April 2022; and suspended Golden in February 2023.[215] But these responses are so weak as to support the inference of a bad-faith decision not to take meaningful action, not the opposite.

When the Board "terminated" Bjorkman, it allowed him to continue getting paid and to continue selling real estate, and declined to fire his alleged accomplice, Golden.[216] The Board launched the internal investigation almost two years after the Board knew of the misconduct. That investigation was led, against the advice of outside counsel, by two individuals who were involved in the decision to reject Agent Five's sponsorship change request.[217] And the Board took no action against Golden for more than two years, despite knowing of Golden's misconduct in fall 2020, only terminating his contract after the first anti-trafficking suit was filed and Golden entered vested status.[218]

Defendants also point to changed policies as countervailing facts demonstrating a good faith response. To support their contention that eXp adopted new policies and procedures, Defendants rely on a single statement in the Complaint asserting that eXp "used an anonymous email system" after "allegations of sexual assault surfaced."[219] But the next statement in the Complaint explains that the

---

[215] Compl. ¶ 82.

[216] *Id.* ¶¶ 82–84.

[217] *Id.* ¶¶ 82, 123.

[218] *Id.* ¶¶ 48–55, 82.

[219] Compl. ¶ 36; *see* eXp Opening Br. at 16, 42.

anonymous email system was for employees, not agents.[220] Human Resources and eXp's Director of Diversity and Employee Success were not "allowed to know the process for anonymous emails" and were not able to process complaints from agents.[221] And the Complaint asserts that few agents knew about the email reporting system, and those who were aware stated that they did not trust it.[222] Indeed, the Complaint alleges that neither Human Resources nor eXp's Director of Diversity and Employee Success was permitted to intervene to process anonymous complaints. In essence, Defendants ask the court to draw inferences concerning changed policies to contradict what Plaintiff has alleged, but the court must do the opposite on a motion to dismiss.

In the end, as alleged, the Board changed no eXp policy, enacted none of the Whistleblower's suggestions for reform, ignored outside counsel's advice, and took no meaningful steps to address the systemic problem of rape at eXp. It is reasonable to infer that the Board effectively did nothing in response to the Company-wide allegations of drugging, rape, and sexual assault at the heart of the red flags.

---

[220] Compl. ¶ 36.

[221] *Id.* ¶¶ 36, 38.

[222] *Id.* ¶ 36.

The Board's effective inaction distinguishes this case from the authorities on which Defendants rely: *McDonald's*,[223] *Corbat*,[224] *Clem*,[225] *GoPro*,[226] *TransUnion*,[227] *Qualcomm*,[228] and *Abney*.[229] Defendants' authorities involved significant and timely responses to the alleged red flags.

In *McDonald's*, the court found that the complaint failed to state a viable oversight claim because the board took action within a month of being on notice of red flags and made many changes at the enterprise level.[230]

In *Corbat*, the documents incorporated by reference in the complaint explained that the "board and its various committees oversaw significant efforts" to comply with the law where red flags were waved.[231]

In *Clem*, the board resolved unlawful billing practices within months of

---

[223] 291 A.3d 652 (Del. Ch. 2023).

[224] *Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240 (Del. Ch. Dec. 18, 2017).

[225] *Clem v. Skinner*, 2024 WL 668523 (Del. Ch. Feb. 19, 2024).

[226] *In re GoPro, Inc.*, 2020 WL 2036602 (Del. Ch. Apr. 28, 2020).

[227] *In re TransUnion Deriv. S'holder Litig.*, 324 A.3d 869 (Del. Ch. 2024).

[228] *In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723 (Del. Ch. June 16, 2017).

[229] *Horman v. Abney*, 2017 WL 242571 (Del. Ch. Jan. 19, 2017).

[230] *McDonald's*, 291 A.3d at 683. The board's action included (i) updating its anti-harassment policy, (ii) engaging the Rape, Abuse & Incest National Network to advise the company, (iii) creating a new hotline and training programs after a comprehensive review, (iv) conducting a cultural assessment, (v) creating a new franchisee guide with best practices for establishing and maintaining a successful workplace, and (vi) ending the Company's policy requiring mandatory arbitration of harassment and discrimination claims.

[231] *Corbat*, 2017 WL 6452240, at *16.

learning of a whistleblower action, and the audit committee reported updates to the board in the meantime.[232]

In *GoPro,* the board recalled a defective product mere days after online videos showed the defect.[233]

In *TransUnion,* the court rejected the plaintiffs' red-flags theory because the board took action "almost immediately" to comply with the CFPB's consent order and did so in accordance with advice from outside counsel.[234] Where there were outstanding issues that took time to be resolved, the board oversaw management's efforts to make improvements and received regular updates about those efforts.[235]

And in *Qualcomm* and *Abney*, the court rejected claims where the very red flags that the plaintiffs argued were waved in front of the board—notably, audit committee reports—also described the board's planned remedial action.[236]

Plus, both *Clem* and *GoPro* involved discrete products and practices where termination or recall could validly constitute the entirety of a fulsome response. Here, the Complaint alleges the Board knew by 2021 that there were dozens of participants in the assaults of agents and recruits that Bjorkman and Golden had

---

[232] *Clem*, 2024 WL 668523, at *9–11.

[233] *GoPro*, 2020 WL 2036602, at *13.

[234] *TransUnion*, 324 A.3d 869, 888–90 (Del. Ch. 2024)

[235] *Id.* at 891.

[236] *Qualcomm*, 2017 WL 2608723, at *3–4 (Del. Ch. June 16, 2017); *Abney*, 2017 WL 242571, at *13–14 (finding that audit committee presentations identifying problematic compliance activity also laid out remedial actions).

drugged.[237] It strains credulity to suggest that terminating a single individual, without at least attempting to identify other perpetrators or the circumstances surrounding the criminal and tortious conduct, could reasonably be classified a good-faith response that merely failed to hit a target.[238]

According to the Complaint, the Board here knew of people within the Company, like Golden, who were directly responsible for pervasive drugging, rape, and sexual assault. The Board chose to not to address the issue for years, terminating Golden only after survivors filed federal anti-trafficking suits and Golden's revenue sharing rights had vested. The Board refused outside counsel's advice to conduct an independent investigation. And the Board approved Conord's retirement, which was prompted by his own sexual misconduct, on false pretenses and then allowed him to rejoin the Company. Just as *Caremark* imposes a "bottom-line" requirement concerning information systems,[239] *Caremark* imposes a bottom-line requirement to respond in good faith to red flags of central legal risks. At a minimum, efforts to respond to red flags are not sufficient under *Caremark* when it is reasonably conceivable that those efforts were nominal, tainted by deliberate heel-dragging, and ran parallel to a campaign of concealment. All of that is reasonably conceivable here.

Count III states a claim.

---

[237] Compl. ¶ 29.

[238] Defendants also cite *Shabbouei v. Potdevin*, 2020 WL 1609177 (Del. Ch. Apr. 2, 2020), but that case did not involve a *Caremark* claim. *Id.* at *7.

[239] *Marchand*, 212 A.3d at 821; *see also Boeing*, 2021 WL 4059934, at *25, *33.

70

### 3. Claim That The Control Group Breached Its Oversight Obligation

Plaintiff claims that the Control Group members (Sanford, Frederick, and Gesing) breached their fiduciary duties in two ways. In the Complaint, Plaintiff alleges that the Control Group breached information-system and red-flag oversight obligations.[240] According to Plaintiff, the Control Group "could have wielded [its] control over eXp's Board and management to address these very serious issues and minimize the likelihood of 'serious injury to the corporation,'" but failed to do so.[241] In briefing and argument, Plaintiff advances a second theory by recasting allegations of intentional misconduct specific to Sanford—for example, that Sanford actively covered up reports of sexual misconduct—as allegations against the Control Group.

Plaintiff's first theory requires that the group members comprised a group that exerted general control over the Company and owed oversight obligations. The Control Group members do not dispute at this stage that they comprised a group that exerted general control over the Company and owed fiduciary duties. They argue that controllers do not owe oversight duties.[242]

No Delaware case has concluded that controllers owe oversight duties in their controller capacity.[243] As the basis for their claim that controllers owe oversight obligations, Plaintiff relies on the premise that controllers owe the same fiduciary

---

[240] Compl. ¶ 176.

[241] Dkt. 43 ("Pl.'s Answering Br.") at 52–53 (quoting *McDonald's*, 291 A.3d at 680).

[242] *See* Dkt. 28 ("Gesing Br."), Section II.

[243] *See Schertz v. Garcia*, C.A. No. 2023-0600, Dkt. 48 at 26:4–20 (Del. Ch. Sept. 25, 2024) (TRANSCRIPT) (discussing this issue generally).

obligations as directors. For that proposition, Plaintiff cites a footnote in this court's decision in *McRitchie v. Zuckerberg*, stating:

> Delaware cases have equated the duties of stockholder controllers with those of directors.[244] When a stockholder controller exercises board-level control, takes over the corporate machinery, and effectively substitutes its wishes for those of the board of directors, then the proposition of fiduciary equivalence is accurate.[245]

The cited footnote, however, concludes that "a careful review of Delaware precedent indicates that stockholder controllers do not always owe the same duties as directors."[246] The footnote cites *Sears*, where Vice Chancellor Laster conducted that careful review.

*Sears* involved a claim that a controller breached his fiduciary obligations by taking action by written consent to prevent a board-approved liquidation.[247] The court conducted a scholarly analysis of the nature and scope of controller obligations in two common scenarios: first, when the controller exercises stockholder-level power to sell or vote; and second, when the controller uses "its influence over the board and management to wield corporate power indirectly and cause the corporation to act."[248]

---

[244] 315 A.3d 518, 533 n.12 (Del. Ch. 2024) (collecting cases).

[245] Pl.'s Answering Br. at 53 (quoting *Zuckerberg*, 315 A.3d at 533 n.12).

[246] *Zuckerberg*, 315 A.3d at 533 n.12 (citing *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 500 (Del. Ch.), *modified on reargument,* (Del. Ch. 2024)).

[247] *Sears*, 309 A.3d at 483.

[248] *Id.* at 506–07.

72

*Sears* involved the first scenario—a challenge to a controller's exercise of stockholder-level power—which is where the court's analysis focused.

To dramatically oversimplify a thorough discussion, the court observed that the historical starting point for control obligations is that stockholders have "no duty" to sell and no duty to vote, even when failing to do so would harm the minority.[249] Rather, a controller can only be liable after having decided to sell or when exercising voting power, and only then when acting affirmatively to change the status quo.[250]

*Sears* thus articulated a theory of Delaware law that restricts the scope of a controller's obligations compared to those of a director. A controller owes limited fiduciary obligations only when affirmatively exercising its stockholder power to change the status quo. A director owes the full panoply of fiduciary duties in all circumstances. Thus, here, to the extent that Plaintiff's theory rests on the simplified statement of Delaware law that controllers owe the same fiduciary duties as directors, it fails under the persuasive reasoning of *Sears*. Controllers do not owe the same scope of fiduciary obligations as directors.

Plaintiff's theory of controller liability also fails to the extent that Plaintiff challenges the Control Group's failure to use its stockholder-level powers. *Sears* explains that stockholder-level action can only give rise to fiduciary duties when wielded affirmatively, and only then in limited circumstances. Oversight obligations,

---

[249] *Id.* at 508.

[250] *Id.* at 510.

by contrast, impose liability for inaction. Thus, stockholder-level power can never give rise to fiduciary oversight obligations.

Perhaps for this reason, Plaintiff draws on the second *Sears* scenario, arguing that the Control Group had the ability to use "its influence over the board and management to wield corporate power indirectly and cause the corporation to act."[251] *Sears* states that: "Having effectively moved into the boardroom, the controller becomes subject to the same fiduciary standards that apply to directors."[252] Plaintiff thus argues that, having moved into the boardroom, the Control Group owes the same fiduciary duties as directors.

For the proposition that this second scenario giving rise to control duties creates duties coterminous in scope with those of directors, *Sears* cites to authorities that involved or contemplated some action by the controller—"exercis[ing] corporate power," "directing the actions of the corporation," "imposing its policy upon" the corporation, and "caus[ing] specific corporate action."[253] And by articulating the scenario as one where the controller "indirectly . . . *cause[s] the corporation to act*," *Sears* suggests that the second scenario, like the first, gives rise to fiduciary duties only when the controller takes action.[254] But because the facts of *Sears* did not challenge controller conduct that relied on board-level control, the court did not

---

[251] *Id.* at 506.

[252] *Id.*

[253] *Id.* at 506 n.14.

[254] *Id.* at 506 (emphasis added).

74

elaborate on this language one way or another. The open question is thus whether a controller's fiduciary obligations are limited to situations when the controller causes the corporation to act, which would foreclose *Caremark* claims against a controller.

Again, no decision of this court has directly addressed this issue. The parties cite no case in which this court sustained a claim against a controller for breach of fiduciary duties based on the controller's inaction. And independent research revealed none.

It is hard to conceive of any scenario where a controller could be liable for inaction necessary to support oversight liability under *Caremark*. The thought experiment prompts many questions. What would a controller's obligation to impose information systems look like? Does a controller have an independent obligation to establish an information system where the board has failed to do so? Is a controller obligated to ensure the efficacy of information systems established by the board? Should a controller override information systems established by the board? And what about red flags? Information systems are designed to surface red flags to the board. Should a controller require mandatory reporting to the controller? If a controller learns of a red flag regardless of the source, is a controller independently obligated to ensure that the board responds?

An affirmative response to any of these questions would seem to place a controller in a situation of having to second-guess the board at every turn for fear of liability. That obligation would invite greater board-level incursions by controllers and risk undermining Delaware's board-centric model.

Even if board-level control could lead to controller oversight obligations—and for reasons stated above, that would be a big move—then, at a minimum, the usurpation or delegation of board-level and managerial power would have to be so extensive as to justify imposing on the controller all obligations attendant to overseeing the corporation. The Complaint does not support that inference. The Control Group held enough voting power to control any stockholder vote. And the Control Group members occupied multiple high-level leadership positions on the Board and in management. But none of that authority was so extensive as to justify rendering the Control Group responsible for overseeing the Company or liable for their failure to do so.

Count I fails to state a claim.

## B.     Rule 23.1

As discussed above, "[a] cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[255] "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[256] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the

---

[255] *Aronson*, 473 A.2d at 811 (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm*, 746 A.2d 244.

[256] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[257]  The demand requirement is a substantive principle under Delaware law.[258]

Rule 23.1 is the "procedural embodiment" of the demand requirement.[259] Under Rule 23.1, a derivative complaint must "state with particularity: . . . any effort by the derivative plaintiff to obtain the desired action from the entity; and . . . the reasons for not obtaining the action or not making the effort[.]"[260]

A stockholder can satisfy the demand requirement by pleading that demand is futile.  In *Zuckerberg*,[261] the Delaware Supreme Court adopted the "universal test" for demand futility that blends elements of the two precursor tests: *Aronson*[262] and *Rales*.[263]  When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

---

[257] *Id.*

[258] *Id.*; *see* Ct. Ch. R. 23.1(a).

[259] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[260] Ct. Ch. R. 23.1(a)(1).

[261] 262 A.3d 1034 (Del. 2021)

[262] 473 A.2d 805 (Del. 1984).

[263] 634 A.2d 927 (Del. 1993).

77

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[264]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[265] Although the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[266]

To plead demand futility under any *Zuckerberg* theory, a stockholder must allege "particularized factual statements that are essential to the claim."[267] "It is generally understood that for a fact to be pled 'with particularity,' it must have some

---

[264] *Zuckerberg*, 262 A.3d at 1059.

[265] *Id.*

[266] *Id.* In 2023, the Court of Chancery amended its rules to reflect the Delaware Supreme Court's adoption of the *Zuckerberg* test and modernize the language and presentation of the Rules to bring them closer in style to the Federal Rules of Civil Procedure. *See In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).

[267] *Brehm*, 746 A.2d at 254.

indicia of specificity."[268] A plaintiff must do more than provide notice pleading permitted under Rule 8.[269]

The Rule 23.1 particularity requirement is not as strict as the Rule 9 particularity requirement, because Rule 23.1 does not call for "newspaper facts."[270] "[E]ven with Section 220 documents in hand, derivative plaintiffs would be hard pressed to plead . . . 'who, what, when, where and how' facts about fiduciary wrongdoing" as derivative plaintiffs typically do not have the means to know those "newspaper" facts like fraud claimants do.[271] Still, the particularity requirement of Rule 9 remains a "useful guidepost."[272] Rule 9 requires, "with respect to the subjects

[268] *Elburn ex rel. Invs. Bancorp. Inc. v. Albanese*, 2020 WL 1929169, at *7 (Del. Ch. Apr. 21, 2020) ["*Invs. Bancorp. I*"], *appeal denied sub nom*. *Albanese v. Elburn ex rel. Invs. Bancorp, Inc.*, 237 A.3d 820 (Del. 2020) (TABLE).); *see also United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876–77 (Del. Ch. 2020) ["*Zuckerberg I*"] ("Rule 23.1 requires that a plaintiff allege specific facts[.]"); *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at *10 (Del. Ch. Apr. 27, 2020) (same); *GoPro*, 2020 WL 2036602, at *8 ("The plaintiff pleading demand futility must inform the defendants of the precise transactions at issue by describing with particularity the *specific* misconduct in which each defendant is alleged to have participated." (citation modified)).

[269] *Invs. Bancorp. I*, at *7–9.

[270] *Elburn ex rel. Invs. Bancorp. Inc. v. Albanese,* 2020 WL 4194865, at *4–5 (Del. Ch. July 21, 2020) ["*Invs. Bancorp. II*"] (denying application to certify interlocutory appeal), *appeal denied sub nom*. *Albanese v. Elburn ex rel. Invs. Bancorp, Inc.*, 237 A.3d 820 (Del. 2020) (TABLE).

[271] *Invs. Bancorp II*, 2020 WL 4194865, at *5; *Invs. Bancorp I*, 2020 WL 1929169, at *8 (observing that derivative plaintiffs asserting fiduciary breaches "were not in the board room, and, unlike fraud, were not the direct targets of the wrongful behavior.").

[272] *See Invs. Bancorp I*, 2020 WL 1929169, at *9 (describing this court's "articulation of Rule 9(b)'s pleading requirements" in *Kahn Brothers & Co., Inc. Profit Sharing Plan and Tr. v. Fischbach Corp.*, 1989 WL 109406, at *4 (Del. Ch. Sept. 19, 1989) as "a useful guidepost for Rule 23.1").

it treats, some greater degree of specificity in pleading. The rule gives to defendants a right to insist that the circumstances constituting the alleged fraud be specified."[273]

Rule 23.1 imposes a pleading-stage requirement. "While Rule 23.1 requires that a plaintiff allege specific facts, 'he need not plead evidence.'"[274] And although the requirement of factual particularity is a heightened pleading requirement, it "does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations."[275] "[O]nce a plaintiff pleads particularized allegations, then the plaintiff is entitled to all 'reasonable inferences that logically flow from particularized facts alleged by the plaintiff.'"[276] As the high court explained in *Marchand*, "[t]he standard for conducting this inquiry at the demand futility stage is well balanced, requiring

---

[273] *Kahn*, 1989 WL 109406, at *4.

[274] *Hughes*, 2020 WL 1987029, at *10 (quoting *Aronson*, 473 A.2d at 816); *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *29 (Del. Ch. Apr. 26, 2023) (same); *Zuckerberg I*, 250 A.3d at 877 (same); *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *33 (Del. Ch. Jan. 25, 2016) (same).

[275] *Zuckerberg*, 250 A.3d at 877.

[276] *Hughes*, 2020 WL 1987029, at *10 (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004)) (citation modified); *see also Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *1 n.1 (Del. Ch. Aug. 1, 2016) ("When considering a motion to dismiss under Rule 23.1, this Court affords plaintiffs all reasonable inferences that logically flow from the particularized facts alleged in the complaint." (quoting *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 553205, at *4 (Del. Ch. Feb. 29, 2008))); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56 (Del. Ch. 2015) ("I accept as true Plaintiff's particularized allegations of fact and draw all reasonable inferences that logically flow from those allegations in Plaintiff's favor." (citing *White v. Panic*, 783 A.2d 543, 549 (Del.2001))).

that the plaintiff plead facts with particularity, but also requiring that this Court draw all reasonable inferences in the plaintiff's favor."[277]

The demand analysis is conducted as to the board in place at the time that the claims at issue were "validly in litigation."[278] This rule protects representative plaintiffs by preventing defendants from recomposing a board after a derivative claim is filed to strengthen Rule 23.1 arguments.[279]

When Plaintiff filed this action, the Board comprised six members: Defendants Sanford, Miles, and Cahir; and non-parties Weakley, Pelosi, and Reichheld (the "Demand Board"). Demand Board members Miles, Cahir, Pelosi, and Reichheld are outside directors; they are not employed by the Company. Weakley is a real estate agent within the eXp Realty network. To show demand futility, Plaintiff must allege particularized facts creating a reason to doubt that three of the six Demand Board members were incapable of impartially considering a demand.[280] Defendants concede

---

[277] *Marchand*, 212 A.3d at 818.

[278] *Braddock v. Zimmerman*, 906 A.2d 776, 785 (Del. 2006).

[279] *See Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) ("When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one."); *Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chi. v. Smith*, 2016 WL 3223395, at *10 (Del. Ch. May 31, 2016) (describing as "problematic" a situation "where a manipulation of board composition is employed to discourage meritorious derivative litigation"), *aff'd sub nom. Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chi. ex rel. BioScrip, Inc. v. Smith*, 175 A.3d 621 (Del. 2017) (TABLE).

[280] *InfoUSA,* 953 A.2d at 989–90 ("Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.").

that demand is futile as to Sanford, and Plaintiff does not advance arguments as to Pelosi or Reichheld.[281]  Plaintiff must therefore show demand futility with respect to two of the remaining three Demand Board members: Weakley, Miles, and Cahir.

Plaintiff argues that Weakley's employment relationship with eXp rendered her beholden to Sanford, who received a material personal benefit from the alleged misconduct, and that both Miles and Cahir face a substantial likelihood of liability under *Caremark*.  Because Plaintiff has pled demand futility as to Weakley and Miles, this decision does not reach Plaintiff's arguments as to Cahir to assess demand futility.[282]

"Generally, demand futility is assessed on a claim-by-claim, or Count-by-Count, basis."[283]  When the counts are based on the same factual predicate, however, showing that a director is unfit to impartially consider demand as to one satisfies demand futility as to all.[284]  Here, the counts rest on the same facts and legal theories with the only difference being the named Defendants.  This decision thus consolidates the demand analysis.

---

[281] Defendants argue that demand is only futile if at least four of eXp's six Board members cannot impartially consider a demand, *see* eXp Opening Br. at 18, but where the demand board is even numbered, Delaware law requires that only "half of the members of the demand board" be incapable of impartially assessing a demand for demand to be futile.  *In re Fox Corp. Derivative Litig.*, at *8 (Del. Ch. Dec. 27, 2024).

[282] Plaintiff also argues that Miles lacked independence from Sanford, but this decision need not and does not reach that argument.

[283] *City of Coral Springs Police Officers' Pension Plan v. Dorsey*, 2023 WL 3316246, at *7 (Del. Ch. May 9, 2023), *aff'd*, 308 A.3d 1189 (Del. 2023).

[284] *Id.* & n.40 (collecting cases).

Plaintiff has alleged particularized facts from which it is reasonable to infer that Weakley lacked independence from Sanford.

Weakley derived two-thirds of her income from her role at eXp,[285] and half of that from her independent contractor status. As CEO of eXp, Sanford has the power to terminate Weakley's status as an independent contractor.[286] When a person derives her principal income from her employment, "that fact 'powerfully strengthens the inference' that the [fiduciary] could not consider a demand on the merits, because 'it is doubtful that they can consider the demand . . . without also pondering whether an affirmative vote would endanger their continued employment.'"[287] That is reasonable to infer here.

The fact that the Company identified Weakley as non-independent under both NASDAQ and SEC rules in public filings is not dispositive of the independence analysis under Delaware law, but it does bolster this conclusion.[288] That is because classifying a director as non-independent under NASDAQ and SEC rules is a

[285] Compl. ¶¶ 160–64.

[286] *Id.* ¶¶ 161–62. Even if Weakley satisfies all terms for revenue share vesting, it historically accounted for approximately one third of her eXp Realty-based income. Compl. ¶ 162. *See Sciabacucchi v. Liberty Broadband Corp.*, 2022 WL 1301859, at *29 (Del. Ch. May 2, 2022) (excusing demand where, among other factors, director "reli[ed] on . . . compensation as a source of primary income").

[287] *See, e.g.*, *Ezcorp*, 2016 WL 301245, at *35 (quoting *Mizel v. Connelly*, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999)).

[288] Compl. ¶ 160.

"fundamental determination that a board must make," that "is also relevant under [Delaware] law" in the context of demand futility.[289]

In response to the allegations that Weakley's agent status renders her beholden to Sanford, Defendants argue that eXp Realty's independent contractors cover their own expenses and insurance.[290] Defendants also contend that Weakley is free to associate with a different firm, bring her current commissions with her, and possibly enjoy the same level of commission income at her new firm.[291] But these arguments seek defendant-friendly inferences based in part on hypothetical facts. They do not rebut the allegation that Sanford controls Weakley's primary source of income.

Plaintiff has also alleged particularized facts from which it is reasonable to infer that Sanford received a material personal benefit from the alleged misconduct. Bjorkman, Golden, and Gove are all in Sanford's downline.[292] The revenue share program allowed Sanford to extract "unlimited" bonuses from the continued performance of each of these persons.[293] And Defendants effectively concede this point by failing to advance demand arguments concerning Sanford.

---

[289] *Sandys v. Pincus*, 152 A.3d 124, 132–34 (Del. 2016); *see also Ezcorp*, 2016 WL 301245, at *36 (noting NASDAQ independence standards and Delaware law "are mutually reinforcing and seek to advance similar goals").

[290] eXp Opening Br. at 47.

[291] *Id.*

[292] Compl. ¶ 149.

[293] *Id.* ¶¶ 4, 148.

Plaintiff has thus alleged particularized facts from which the court can infer that Weakley lacked independence from a person who received a material benefit from the challenged action. That is sufficient to create a reasonable doubt of Weakley's ability to impartially consider a demand.

Turning to Miles, Plaintiff argues that Miles cannot impartially consider a demand because he faces a substantial likelihood of liability on claims that would be the subject of the litigation demand. As discussed above, Plaintiff has adequately alleged under Rule 12(b)(6) that Miles actively breached his oversight obligations. That forces the question: What is the relationship between stating a claim under Rule 12(b)(6) and demonstrating that demand is futile based on a substantial likelihood of liability under Rule 23.1?

The "substantial likelihood of liability" standard derives from *Aronson*.[294] Before *Aronson*, Delaware law suggested that a plaintiff could show that demand was futile simply by naming a director as a defendant or by alleging that the director was involved in the challenged decision.[295] *Aronson* dispelled that notion by introducing the "substantial likelihood of liability" standard.

---

[294] *Aronson*, 473 A.2d at 815 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.").

[295] *See, e.g.*, *Kaufman v. Beal*, 1983 WL 20295, at *4 (Del. Ch. Feb. 25, 1983) (holding that failure to make pre-suit demand is excused where the derivative plaintiff pleads facts "which, if true, would show that the business judgment rule would not protect the transaction from judicial scrutiny"); *Miller v. Loft , Inc.*, 153 A. 861, 862 (Del. Ch. 1931) ("The rule is well settled in this State that if by reason of hostile interest or guilty participation in the wrongs complained of, the directors cannot be expected to

The Delaware Supreme Court in *Rales* further clarified that, although *Aronson* uses the phrase "substantial likelihood," it is still a pleading standard. The court held that, "[t]o plead that a director faces a substantial risk of liability, a plaintiff does not have to demonstrate a reasonable probability of success on the claim" sufficient to support a preliminary injunction.[296] The high court rejected that requirement as "unduly onerous," stating that the plaintiff need only "make a threshold showing, through the allegation of particularized facts, that [its] claims have some merit."[297] *Aronson* and *Rales* remain good law.[298]

Many decisions of this court have interpreted the "have some merit" language of *Rales* to require application of the Rule 12(b)(6) standard, albeit based on particularized facts.[299] Furthermore, as held in *Marchand* and elsewhere, derivative

institute suit[.]"); *Baker v. Bankers' Mortg. Co.*, 129 A. 775, 776 (Del. Ch. 1925) (holding that demand is not required "for obvious reasons" where the corporate managers were "guilty [of] participation in the wrongs complained of"); *Fleer v. Frank H. Fleer Corp.*, 125 A. 411, 414 (Del. Ch. 1924) ("Where the demand if made would be directed to the particular individuals who themselves are the alleged wrongdoers and who therefore would be invited to sue themselves, the rule is settled that a demand and refusal is not requisite."). More recent cases preceding *Aronson* acknowledged the problem with allowing derivative plaintiffs to evade the demand requirement by merely adding the corporate directors to its complaint and therefore held that merely adding directors and making conclusory allegations of alleged wrongdoing were insufficient to excuse demand. *See, e.g.*, *Kaufman*, 1983 WL 20295, at *4.

[296] *Hughes*, 2020 WL 1987029, at *12.

[297] *Rales*, 634 A.2d at 934 (citing *Aronson*, 473 A.2d at 811–12).

[298] *Zuckerberg*, 262 A.3d at 1059 ("Finally, because the three-part test is consistent with and enhances *Aronson*, *Rales*, and their progeny, . . . cases properly construing *Aronson, Rales*, and their progeny remain good law.").

[299] I have done so many times based on my reading of *Rales*. *See, e.g.*, *Brewer v. Turner*, 2025 WL 2769895, at *9 (Del. Ch. Sept. 29, 2025) (denying motion to dismiss); *Brewer v. Turner*, 2025 WL 3048942, at *5 (Del. Ch. Oct. 30, 2025) (denying motion

to certify interlocutory appeal); *In re Plug Power Inc. S'holder Litig.*, 2025 WL 1277166, at *9 (Del. Ch. May 2, 2025); *Hanna v. Paradise*, 2025 WL 1836642, at *8 (Del. Ch. July 3, 2025); *Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890, at *7 (Del. Ch. Feb. 1, 2024); *City of Detroit Police & Fire Ret. Sys. ex rel. NiSource, Inc. v. Hamrock*, 2022 WL 2387653, at *11 (Del. Ch. June 30, 2022).

Others have taken a similar approach. *See, e.g.*, *Lipman v. GPB Cap. Hldgs. LLC*, 2020 WL 6778781, at *1 (Del. Ch. Nov. 18, 2020) ("I find that the allegations of the Complaint . . . make the threat of liability to the general partner, and its controller, such that it is *reasonably conceivable* that the general partner could not bring its business judgment to bear on any demand involving these allegations." (emphasis added)); *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *25 (Del. Ch. Aug. 24, 2020) (finding that the "Plaintiffs have demonstrated that a majority of [the board] faces a substantial likelihood of liability by pleading particularized facts from which it is *reasonably conceivable* that a majority of the Board knew of evidence of corporate misconduct—the proverbial red flag—yet acted in bad faith by consciously disregarding its duty to address that misconduct" (emphasis added) (internal quotation marks omitted)); *Fitbit*, 2018 WL 6587159, at *12–13 ("In this case, the demand futility question as to Count II turns on whether a majority of the Demand Board faces a substantial likelihood of liability on the *Brophy* claim . . . . I find that the causal connection *is pled with particularity and is reasonably conceivable*. Plaintiffs have adequately pled that the information at issue was material and nonpublic." (emphasis added)); *Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL 2644475, at *12–13 (Del. Ch. June 28, 2021), *aff'd*, 273 A.3d 750 (Del. 2022) ("It is not *reasonably conceivable* that the Board acted in bad faith in consciously disregarding its duty to oversee the affairs of the Company. . . . Plaintiff has *failed to plead particularized facts that make it reasonably conceivable* a majority of the [defendants] face a substantial likelihood of liability for ignoring red flags in a manner demonstrating a conscious failure to monitor or oversee corporate operations." (emphasis added)); *Corbat*, 2017 WL 6452240, at *2 ("To my mind, the allegations of the Complaint, if true, fail to demonstrate scienter. The Complaint does not make it *reasonably conceivable* that the directors acted in bad faith." (emphasis added)); *Silverberg ex rel. Dendreon Corp. v. Gold*, 2013 WL 6859282, at *13 (Del. Ch. Dec. 31, 2013) ("I conclude that [the plaintiff] has pled particularized facts sufficient to show that it is *reasonably conceivable* that he will be able to satisfy the first factor of a *Brophy* claim." (emphasis added)); *Cent. Laborers' Pension Fund v. Karp*, 2025 WL 1213104, at *19 & n.204 (Del. Ch. Apr. 25, 2025) (stating that the court "must view well-pleaded facts holistically in assessing demand futility" and that "the test is whether the complaint alleges a constellation of particularized facts which, when viewed holistically, *support a reasonably conceivable inference* that an improper purpose sufficiently infected a director's decision to such a degree that the director could be found to have acted in bad faith" (emphasis added) (internal quotation marks omitted) (quoting *IBEW Local*

87

plaintiffs are entitled to all "reasonable inferences" that logically flow from particularized allegations.[300] No meaningful distinction exists between what is reasonably conceivable based on particularized allegations, on the one hand, and what is reasonably inferable from particularized allegations, on the other. Indeed, decisions of this court have used "reasonably conceivable" and "reasonable inference" interchangeably when analyzing demand futility.[301]

Putting it all together, a plaintiff can demonstrate a substantial likelihood of liability for demand futility purposes by pleading a claim that meets the Rule 12(b)(6) standard based on particularized factual allegations.[302]

---

*Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 623 (Del. Ch. 2023))).

[300] *Marchand*, 212 A.3d at 818; *Invs. Bancorp I*, 2020 WL 1929169, at *6.

[301] *See, e.g.*, *IBEW*, 301 A.3d at 619, 623 ("Delaware decisions have read [Rule 9(b) and Rule 23.1] together to require that a plaintiff plead particularized facts that can support a *reasonable inference* about the directors' state of mind. . . . At the pleading stage, the test is whether the complaint alleges a constellation of particularized facts which, when viewed holistically, support a *reasonably conceivable inference* that an improper purpose sufficiently infected a director's decision to such a degree that the director could be found to have acted in bad faith." (emphasis added)); *Chou*, 2020 WL 5028065, at *1, *25 ("In order to survive a motion to dismiss under Rule 23.1, a plaintiff must raise an inference that demand on the board to undertake the action would have been futile. Typically, in the *Caremark* context, this requires a pleading of specific facts from which the Court may infer a substantial likelihood of liability on the part of a majority of the board on whom demand would have been made. . . . The Plaintiffs have demonstrated that a majority of ABC's Board faces a substantial likelihood of liability by pleading particularized facts from which it is *reasonably conceivable* that a majority of the Board "knew of evidence of corporate misconduct— the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct."(emphasis added)).

[302] Defendants dispute this articulation of Delaware law. They contend that a "substantial likelihood of liability may require more than a reasonably conceivable claim," even on based on particularized facts. Defs.' Supp. Br. at 10. Defendants cite *Credit Glory* for this statement, but the passage of *Credit Glory* on which they rely

Plaintiff has stated a claim against Miles based on particularized factual allegations. Plaintiff alleges that Miles received the same red flags that the full Board received. As discussed above, particularized pleading requires a degree of specificity but does not require the "'who, what, when, where and how' facts about fiduciary wrongdoing" required under Rule 9.[303] Plaintiff's red-flag allegations exceed this standard. The Complaint pleads facts about the viral post in September 2020, the eleven-page memorandum sent to a Board member in October 2020, the email report sent to the full Board in 2022.

As to Miles alone, the Complaint alleges that he knew about and openly discussed the culture of drug use and sexual assault at eXp events, including the 11:00 p.m. "rule" and Conord's participation.[304] The Complaint alleges that Miles told the Whistleblower about Conord's other sexual misconduct and called that information "hush hush" in December 2021.[305] These are highly specific allegations, which identify when and to whom Miles made statements, and which exceed the particularity of allegations found in other oversight cases that have survived a motion to dismiss.

---

does not address the issue. Defs.' Supp. Br. at 6–7 (citing *Credit Glory*, 2025 WL 3439671, at *3 n.34). It merely restates the standard that this decision endeavors to explain.

[303] *Invs. Bancorp II*, 2020 WL 4194865, at *5; *Invs. Bancorp I*, 2020 WL 1929169, at *8.

[304] Compl. ¶ 103.

[305] *Id.* ¶ 104.

Having alleged particularized facts sufficient to create a reasonable doubt of the ability of Weakley and Miles to impartially consider a demand, and given Defendants' concessions regarding Sanford, Plaintiff has shown that demand would be futile. The motion to dismiss the Complaint under Rule 23.1 is denied.

## III. CONCLUSION

The motions to dismiss Count I under Rule 12(b)(6) is granted. The motions to dismiss all other counts are denied.